408 A.2d 496

**Frank SPECK, Jr. and Dorothy Speck, his wife; and Valerie Speck, a minor, Lee Ann Speck, a minor, and Francine Speck, a minor, by their parent and natural guardian, Frank Speck, Jr., Appellants,**

**v.**

**Richard A. FINEGOLD and Henry J. H. Schwartz.**

Superior Court of Pennsylvania.

Argued April 14, 1977.

Decided July 25, 1979.

Petition for Allowance of Appeal Granted Dec. 18, 1979.

Thomas Hollander, Pittsburgh, for appellants.

David H. Trushel, Pittsburgh, for appellee Finegold.

Bruce R. Martin, Pittsburgh, for appellee Schwartz.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

CERCONE, Presiding Judge:

This case comes before us on plaintiffs' appeal from the lower court's order sustaining defendant-physicians' preliminary objections to certain allegations contained in plaintiffs' complaint.[1] The intended effect of the preliminary objections is to terminate plaintiffs' lawsuit on grounds that plaintiffs' action is contrary to law and public policy.[2] The matter before us, of first impression in the appellate courts of Pennsylvania, presents for judicial inquiry and decision the cognizability of an action in law brought by plaintiffs to recover damages against defendant-physicians whose alleged acts of negligence resulted in the birth of a child they feared would be born with mental and physical abnormalities. We affirm the order of the lower court in part and reverse and remand in part.

The difficulties presented in this case are aptly described in the words of Mr. Justice Blackmun in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147, reh. den. 410 U.S. 959, 93 S.Ct. 1409, 35 L.Ed.2d 694 (1973), a case overturning a Texas statute on constitutional grounds, concerning a woman's right to abortion:

1. Plaintiffs' complaint claims damages based on negligence, breach of contract and misrepresentation. This appeal was certified by the lower court to and accepted by this court as a discretionary appeal pursuant to Sec. 501(b) of the Appellate Court Jurisdictional Act, Act of July 31, 1970, P.L. 673, No. 223, Art. V, § 501; 17 P.S. § 211.501(b) (Supp.1977–78).

2. Defendants filed preliminary objections in the nature of a demurrer, motions to strike and for more specific pleadings under Pa.R.C.P. 1017.

"We forthwith acknowledge our awareness of the sensitive and emotional nature of the abortion controversy, of the vigorous opposing views, even among physicians, and the deep and seemingly absolute convictions that the subject inspires. One's philosophy, one's experiences, one's exposure to the raw edges of human existence, one's religious training, one's attitudes toward life and family and their values, and the moral standards one establishes and seeks to observe, are all likely to influence and to color one's thinking and conclusions about abortion. . .

"Our task, of course, is to resolve the issue by [resort to legal principles] free of emotion and predilection." 410 U.S. at 116, 93 S.Ct. at 709.

From its earliest days, the common law held to the principle that "in civil court the death of a human being could not be complained of as an injury." *Baker v. Bolton,* 1 Campb. 493, 170 Eng.Rep. 1033 (K.B. 1808). The reluctance of the judiciary to risk going beyond a principle that a tort died with its victim, *Huggins v. Butcher,* Brownl. & G. 205 (ed. 3d.), 123 Eng.Rep. 756 (C.P. 1675), became the impetus to legislative recognition of the cause of action since known as a "wrongful death" action, now an everday source of litigation in the courts. See, generally, Prosser, *Law of Torts* 901 (4th ed. 1971).

The courts today are now drawn into a new era of legal theory, one testing the validity of a cause of action generally termed "wrongful life." [3] As stated by the New York Court of Appeals, "[e]ven as a pure question of law, unencumbered by unresolved issues of fact, the weighing of the validity of a cause of action seeking compensation for a wrongful causation of life itself casts an almost Orwellian shadow,

**3.** This kind of case has become interchangeable by the courts as a "wrongful life," "wrongful birth," and "wrongful conception" case. See 31 U. of Miami L.R. 1409 (1977); 83 A.L.R.3d 15 (1978). Although the terms are used interchangeably, they are distinguishable. See *infra,* page 502. These actions are brought to recover damages based on negligence of doctors, pharmacists, hospitals and others in the medical profession for wrongfully allowing a particular child or children to be born.

348

premised as it is upon concepts of genetic predictability once foreign to the evolutionary process. It borders on the absurdly obvious to observe that resolution of this question transcends the mechanical application of legal principles." *Becker v. Schwartz,* 46 N.Y.2d 401, 408, 413 N.Y.S.2d 895, 898, 386 N.E.2d 807, 810 (1978).

However, this decision of the New York Court of Appeals, after raising the specter of improbabilities approaching the supernatural, comes to grips with reality and succumbs to the gravitational pull of human values when it finally concedes any such resolution, whatever it may be, must invariably be colored by notions of public policy, the validity of which remains, as always, a matter upon which reasonable persons may disagree.

■ Frank Speck, Jr. is a victim of the disease known as neurofibromatosis, a crippling disease of the fibrous structures of the nerves. In fact, his two children, Valerie and Lee Ann, are victims of this disease. In Lee Ann it is particularly crippling and disfiguring. Concerned with the possible recurrence of his affliction in a child conceived in the future, Frank and his wife, Dorothy, decided to limit the size of their family.[4] Frank decided it would be best if he were made sterile in order to prevent such a consequence. For this reason he went to defendant-physician, Dr. Finegold, a licensed physician and surgeon in urology, for his

4. Where the purpose of limiting the size of family is to prevent the birth of a defective child, the preventive measures are referred to as eugenic. *Gleitman v. Cosgrove,* 49 N.J. 22, 227 A.2d 689 (1967). Where the reason is to prevent possible harm to the mother's health or life from her pregnancy, the term used is therapeutic. *Custodio v. Bauer,* 251 Cal.App.2d 303, 59 Cal.Rptr. 463 (1967); *Christensen v. Thornby,* 192 Minn. 123, 255 N.W. 620 (1934); and where performed to limit the size of the family for economic reasons then the term is contraceptive or socio-economic. *Shaheen v. Knight,* 6 Lyc.Rptr. 19, 11 Pa.D. & C.2d 41 (1957). In the instant case, although plaintiffs refer to the abortion as performed for therapeutic reasons, there is no specific allegation that Mrs. Speck's health or life was in danger and, therefore, the terms eugenic and socio-economic are more proper terms here.

advice and treatment with respect to a vasectomy procedure.[5]

After examining Mr. Speck, Dr. Finegold represented to him that a vasectomy operation would sterilize him. Pursuant to an oral agreement to that effect reached between the parties on April 28, 1974, Dr. Finegold performed the vasectomy. Following the operation, Dr. Finegold assured Mr. Speck that he was made sterile and that he could engage in sexual relations with his wife without contraceptive devices. (The complaint does not state any specific time had passed before Dr. Finegold made his reassuring statement.) Mr. Speck followed this advice and Mrs. Speck became pregnant. Worried that Mrs. Speck's pregnancy might result in the dreaded consequences they wished to avoid, the Specks then sought advice and treatment by defendant-doctor, Dr. Schwartz, a physician and surgeon practicing in the field of obstetrics and gynecology. Pursuant to an oral agreement, the parents engaged Dr. Schwartz to perform an abortion on Mrs. Speck in order to terminate her pregnancy. On December 27, 1974, Dr. Schwartz performed the abortion procedure and subsequently represented to the Specks that the operation was a success and that Mrs. Speck's pregnancy had been terminated. However, sometime after the operation, Mrs. Speck informed Dr. Schwartz that she felt her pregnancy was continuing. The doctor "again and persistently" assured and represented to the Specks that Mrs. Speck's fetus had been aborted. However, on April 29, 1975, Mrs. Speck gave birth to a premature child, Francine, afflicted with the crippling disease of neurofibromatosis. Throughout, the motivating purpose of the Specks' willingness to go through these procedures was to prevent the birth of another child who they feared might be born with mental and physical deficiencies.

Plaintiffs commenced this lawsuit based on a five-count complaint in trespass and assumpsit, seeking damages on

5. For a brief description of the surgical procedures for male and female sterilization see Note, Elective Sterilization, 113 U. of Penn. L.R. 416–417 (1965); 19 U. of Pgh.L.R. 802 at 804 (1958).

behalf of the infant, Francine, for "wrongful life"; on behalf of their daughters, Valerie and Lee Ann, for economic hardship;[6] and in their own right, for the pecuniary expenses they have borne and will in the future bear for the care and treatment of their child, Francine. Plaintiffs' complaint also seeks damages for emotional, mental and physical injuries and expenses suffered by plaintiff-parents as the result of the birth of Francine and damages suffered by Frank Speck, Jr. occasioned by the loss of his wife's services. Additionally, plaintiffs claim damages for their personal expenses, pain and suffering, and emotional distress incident to the alleged negligence in the vasectomy and abortion surgeries.

Plaintiffs allege, inter alia, that Francine's birth was the direct and proximate result of the physicians' acts of negligence, breach of contract and misrepresentation in their incorrect medical advice, in their negligent and unskillful diagnosis, care and treatment and for actions of negligence catalogued as: failure to properly perform the surgeries in the possession, employment and exercise of that degree and skill, learning and care required of them as physicians and specialists in their given fields of medicine; in failing to conduct tests to ascertain the success or failure of the vasectomy and abortion procedures; in failing to inform them of the risks involved; and in representing to the plaintiffs that the operations were successful and for the intended purposes, when, in fact, the doctors knew[7] or

**6.** Since the time of the appeal, the claims of plaintiff-parents' daughters, Valerie and Lee Ann, have been withdrawn.

**7.** For discussion of doctors' and specialists' duties of care to treat their patients, see 36 U. of Pgh.L.R. 203 (1974). Basic duties of physician, *Wolfe v. Riggle,* 407 Pa. 172, 180 A.2d 220 (1962); *Alexander v. Knight,* 25 Pa.D. & C.2d 649 (1961); *Arnold v. Koehler,* 39 Wash. 19 (C.P.Pa.1958); "Standard of care of non-specialists—The reasonable physician standard," *Incollingo v. Ewing,* 444 Pa. 263, 282 A.2d 206 (1971); *Donaldson v. Maffucci,* 397 Pa. 548, 156 A.2d 835 (1949); *Hodgson v. Bigelow,* 335 Pa. 497, 7 A.2d 338 (1939); Standard of care required of specialists, "Standard of the 'reasonable physician who devotes special study and attention to certain diseases'," *McPhee v. Reichel,* 461 F.2d 947 (3rd Cir. 1972). The 'locality' requirement *Hodgson v. Bigelow,* supra. See concurring

should have known that they were not.[8]

The lower court, on the basis of the defendant-doctors' demurrers, accepted the facts set forth in the complaint relating to the negligent acts alleged and found that plaintiffs had sustained and will sustain and suffer injuries and damages in the future,[9] but held that no relief was cognizable in law which would permit plaintiffs to recover money damages arising out of or related to the life of Francine. The lower court allowed Mr. Speck's claim for damages incident to the vasectomy to stand for trial. It disallowed Mrs. Speck's claim for damages incident to the abortion procedure because she misjoined her counts in the complaint with those of her husband in violation of Pa.R.C.P. 1020(d)(1), 1020(b), 1028(a), 2228, 2229(a). The lower court, however, has allowed her to amend that part of the complaint and we agree.[10]

opinion of Justice Roberts in *Incollingo v. Ewing,* supra; State of advancement of the profession, *Smith v. Yohe,* 412 Pa. 94, 194 A.2d 167 (1963).

8.  See 36 U. of Pgh.L.R. 203 (1974) on the implied duties of physician based solely on the force of law, such as the duty to consult and disclose as required given the reasonable care doctrine, particularly in cases of physicians who are considered specialists in their fields. These implied duties are in addition to any others arising by reason of specific contract to accomplish a particular result. These are rights and obligations which the law imposes purely because of the relationship between a physician and patient, just as the law imposes terms on the common carrier-passenger relationship or the innkeeper-guest relationship.

9.  As to the effect of a demurrer to a plaintiff's complaint see *Monti v. City of Pittsburgh,* 26 Pa.Cmwlth. 490, 364 A.2d 764 (1976); *Buchanan v. Brentwood F. S. L. Assoc.,* 457 Pa. 135, 320 A.2d 117 (1974); *Reardon v. Wilbur,* 441 Pa. 551, 554, 272 A.2d 888, 890 (1971); *Clevenstein v. Rizzuto,* 439 Pa. 397 at 400–410, 266 A.2d 623 at 624–625 (1970); *Hoffman v. Misericordia Hospital of Philadelphia,* 439 Pa. 501, 503–504, 267 A.2d 867, 868 (1970); *Satchell v. Ins. Placement Fac. of Pa.,* 241 Pa.Super. 287, 361 A.2d 375 (1975).

10.  Defendant-physicians have filed motions for more specific pleadings regarding the details of the oral contract allegedly entered into by the plaintiff-parents and Dr. Finegold. It is inconsistent for a party to both demur to a pleading and at the same time move for a more specific pleading. If a party can demur, then by definition the pleading is specific enough for the party to understand the allega-

■ In denying all claims of plaintiffs relating to the birth of Francine, the lower court based its decision on grounds that any allowance of damages for her birth is not recognized in law and is against public policy, and, in addition, that the damages are of such speculative nature as to be immeasurable. The basis of the lower court's view of public policy is that estimating the worth and sanctity of life as against non-life is a task that goes beyond the ken of human understanding or resolution. We hold that the lower court's denial of all damages arising out of the birth of Francine is untenable. According to the lower court, a cloak of inviolability protects doctors and others in the medical profession when their acts of negligence relate to "wrongful birth" cases despite established principles of law which do not protect these same persons in other categories of negligent care. Thus, we do not agree with the lower court in its blanket protection of a tort-feasor in these cases. To agree with the lower court in the instant case would be to allow an infringement of fundamental rights, which infringements are impermissible in other cases involving negligent conduct. *Bowman v. Davis,* 48 Ohio St.2d 41, 356 N.E.2d 496 (1976), (negligent sterilization case); *Custodio v. Bauer,* 251 Cal. App.2d 303, 59 Cal.Rptr. 463 (1967) (unsuccessful abortion case).

tions contained therein. Otherwise, how would the moving party know what cause of action or defense is stated. In this context it is not for the objecting party to seek evidential details rather clarification. Discovery is available to such a party. See Pa.R.C.P. 4001 et seq.

If the knowledge which the adverse party wishes the pleading party to divulge is knowledge which is more easily known by the adverse party, then a preliminary objection for a more specific pleading should be denied, because it would be obvious that the adverse party merely wants to determine how much his adversary "knows" and could prove and is not requesting the specific pleading because he is in the dark about what the pleading party is claiming. In the instant case, the defendant-physician knows as much about the surrounding circumstances about the alleged oral contract as do the plaintiffs. See 2 Anderson, Pa.Civil Practices, § 1017, at 25 (1976). Therefore, the defendant-physicians' motions for a more specific pleading are denied.

At the outset, the question presented for review is not to decide whether plaintiffs should ultimately prevail in this litigation, nor to decide what damages are recoverable if they do prevail, but rather to decide whether their complaint states a cognizable cause of action in law. Consequently, our problem, based on defendants' demurrers, is to decide whether plaintiffs have set forth a sufficiently cognizable lawsuit within the concept, purpose and function of the judicial process to have their claims considered by a court of law beyond and in addition to those allowed by the lower court. The merits of plaintiffs' claims, if cognizable at law, will be decided at trial where the doctors will also have the fullest opportunity to prove that they were not negligent nor responsible for plaintiffs' damages as alleged in plaintiffs' complaint. The question here, obstinate in its difficulty of solution, is whether and under what theory plaintiffs are entitled to recover.

The term "wrongful life" covers a multifaceted concept under which plaintiffs claim factually divergent wrongs in seeking judicial recognition and relief.[11] In this context, the instant case may appropriately be considered to carry three labels: (a) "wrongful conception" wherein Mr. Speck underwent an unsuccessful vasectomy procedure and together with his wife seeks damages against Dr. Finegold for the "wrongful birth" of a child arising out of a negligent sterilization procedure. This kind of action, as we will see, meets

11. For a discussion of the varied nature of the claims asserted in this area, see, generally, Note, Father and Mother Know Best: Defining the Liability of Physicians for Inadequate Genetic Counseling, 87 Yale L.J. 144 (1978); Comment, Strict Liability: A Lady in Waiting for Wrongful Birth Cases, 11 Cal.W.L.Rev. 136 (1974); Kashi, The Case of the Unwanted Blessing: Wrongful Life, 31 U.Miami Law Rev. 1409 (1977); Note, Torts Prior to Conception: A New Theory of Liability, 56 Neb.L.Rev. 706 (1977); Comment, Preconception Torts: Foreseeing the Unconceived, 48 U.Colo.L.Rev. 621 (1977); Comment, Wrongful Birth: The Emerging Status of a New Tort, 8 St. Mary's L.J. 140 (1976); Remedy for the Reluctant Parent: Physicians' Liability for the Post-sterilization Conception and Birth of Unplanned Children, 27 U.Fla.L.Rev. 158 (1974); Note, A Cause of Action for "Wrongful Life": [A Suggested Analysis], 55 Minn.L.Rev. 58 (1970); Tedeschi, On Tort Liability for "Wrongful Life," 1 Israel L.Rev. 513 (1966).

with mixed reaction by the courts;[12] (b) "wrongful birth" wherein Mr. and Mrs. Speck seek damages against Dr. Schwartz for the birth of a child attributed to a negligent abortion procedure, and a wrongful diagnosis of an existing pregnancy resulting in the deprivation of the mother's choice to terminate the pregnancy within the permissible time period;[13] (c) a "wrongful life" action where an unplanned child seeks recovery for injuries suffered because of the negligent failure to prevent its birth.[14] This kind of action has met with disapproval by the courts.[15]

In reviewing the history of the cases on this subject, we find that the decisions which deny any recovery for "wrongful birth" do so, as did the lower court, primarily on the basis that the sanctity of life precludes a cognizable action in law and/or that it is impossible to measure damages between a child being born, defectively or not, and not being born at all. The courts which point to immeasurability as a

**12.** In *Busman v. Burns Clinic Medical Center,* Mich.Ct. of Appeals, May 22, 1978, the damages were restricted in an unsuccessful vasectomy case because no wrongful life claim was asserted. In *Hackworth v. Hart,* 474 S.W.2d 377 (Ky.1977), a verdict in favor of the defendant-physician in an unsuccessful vasectomy case was reversed on grounds that a jury question on issue of negligence was properly presented. Two months after the vasectomy the father was advised "everything is ok you are clear, go ahead" by the operating physician who prior to the operation had informed plaintiff-father that the operation was 100 percent foolproof.

**13.** See *Debora S. v. Sapega,* 56 A.D.2d 841, 392 N.Y.S.2d 79 (1977) and *Ziemba v. Sternberg,* 45 A.D.2d 230, 357 N.Y.S.2d 265 (1974) sustaining cause of action, and compare with *Rieck v. Medical Protective Company,* 64 Wis.2d 514, 219 N.W.2d 242 (1974), rejecting the cause of action.

**14.** This kind of case includes lawsuits by illegitimate children suing for the fact of coming into the world as stigmatized children. *Williams v. State,* 18 N.Y.2d 481, 276 N.Y.S.2d 885, 223 N.E.2d 343 (1966) (action against the state which had custody of the mother); *Stills v. Gratton,* 55 Cal.App.3d 698, 127 Cal.Rptr. 652 (action against physician for allegedly negligent performance of an abortion); *Zepeda v. Zepeda,* 41 Ill.App.2d 240, 190 N.E.2d 849 (1963) cert. den., 379 U.S. 945, 85 S.Ct. 444, 13 L.Ed.2d 545 (1963) (action against a father).

**15.** See *Becker v. Schwartz,* 46 N.Y.2d 401, 413 N.Y.S.2d 895, 386 N.E.2d 807 (1978); *Park v. Chessin,* 46 N.Y.2d 401, 413 N.Y.S.2d 895, 386 N.E.2d 807; *Elliott v. Brown,* Ala., 361 So.2d 546 (1978).

reason for denying recovery for both parents and child hold that when a child or his parents claim it would be better if the child had not been born, they make it impossible for damages to be measured. *Gleitman v. Cosgrove,* 49 N.J. 22, 227 A.2d 689, 22 A.L.R.3d 1411 (1967) (failure of doctor to inform a pregnant mother of damage of rubella to her expected child subsequently born defective); *Terrell v. Garcia,* 496 S.W.2d 124 (Tex.Civ.App.1973), writ ref'd n.r.e. cert. den. 415 U.S. 927, 94 S.Ct. 1434, 39 L.Ed.2d 484 (1974) (unsuccessful vasectomy); *Hays v. Hall,* 477 S.W.2d 402 (Tex.Civ.App.); rev'd on other grounds, 488 S.W.2d 412 (Tex.1972) (unsuccessful vasectomy).

Although there is no appellate decision in our Commonwealth involving the question of whether parents and children can recover for damages arising out of a "wrongful birth", we do have in one of our lower courts in Pennsylvania an early case, *Shaheen v. Knight,* 6 Lyc.Rptr. 19, 11 Pa.D. & C.2d 41 (1957) (negligent sterilization), in which the court denied damages on grounds of public policy. The court's view was that although sterilization was not against public policy the recovery of damages for the birth of a normal child was foreign to the universal public sentiment of the people. The *Shaheen* court also enlarged on the public policy theme and said, "that it would be unjust for the physician to pay for the 'fun, joy and affection which plaintiff Shaheen will have in the rearing and education of this, defendant's [sic] fifth child'." *Id.* at 23.

In the instant case, despite the added dimension of a mentally and physically deficient child, the lower court also held that the plaintiffs had set forth no cognizable cause of action in law for damages, because the purpose of life was procreation and the worth and sanctity of the child, regardless of the child's defects, was such that any recovery of money would be against public policy. But the lower court misses the point when it bases its opinion on this premise. The question is not the worth and sanctity of life, but whether the doctors were negligent in their surgical attempts at vasectomy and abortion.

Beside being against public policy, one of the arguments against recovery has been that abortion was against the law. *Stewart v. Long Island College Hospital,* 58 Misc.2d 432, 296 N.Y.S.2d 41 (1968), modified 35 A.D.2d 531, 313 N.Y.S.2d 502 (1970), aff'd as modified, 30 N.Y.2d 695, 332 N.Y.S.2d 640, 283 N.E.2d 616 (1972). In *Stewart* the verdict in favor of infant and parents was set aside on the ground that the action was not cognizable in law and further that it was impossible to measure damages in a "wrongful life" case. However, at this time abortion was illegal in New York. The last vestige of this public policy view was eliminated in two cases decided by the Supreme Court of the United States. In *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), the court held that a state statute proscribing the use of contraceptives was an unconstitutional intrusion upon the right of privacy and violated the Fourth and Fifth Amendments to the United States Constitution. In *Roe v. Wade,* supra, the Supreme Court held that the constitutional right to privacy includes the woman's decision whether or not to terminate her pregnancy (absolute during first trimester, qualified during last two trimesters).[16] The court in *Roe* said:

". . . Maternity, or additional offspring, may force upon the woman a distressful life and future. Psychological harm may be imminent. Mental and physical health may be taxed by child care. There is also the distress, for all concerned, associated with the unwanted child, and there is the problem of bringing a child into a family already unable, psychologically and otherwise, to care for it." 410 U.S. at 153,[17] 93 S.Ct. at 727.

**16.** The court invalidated the abortion statute before it because it was too vague and infringed on individual rights under the Ninth and Fourteenth Amendments to the United States Constitution. Thus, if public policy is not violated by termination of pregnancy after its inception, then a fortiori the public policy is not violated by commission of an action having as its purpose the avoidance of conception.

**17.** See Pennsylvania's Abortion Control Act, 35 P.S. § 6601 et seq. (1974) and amendments to the Pennsylvania Human Relations Act, 43 P.S. § 955.2 (1973) which support the view that sterilization and

Since the *Griswold* and *Roe* cases, however, other public policy grounds are still made the basis for denial of recovery in "wrongful birth" cases. These include, inter alia: (1) the injury is too remote from the negligence; (2) the injury is too wholly out of proportion to the wrongdoer; (3) in retrospect it appears too highly extraordinary that the negligence should have brought about the harm; (4) allowance of recovery would be too unreasonable a burden on defendant; (5) allowance of recovery would open the way for fraudulent claims; (6) allowance for recovery would introduce a field of litigation that had no sensible or just stopping point. Usually one of these reasons sufficed to deny recovery in a "wrongful birth" case. E.g., *Rieck v. Medical Protective Company,* 64 Wis.2d 514, 219 N.W.2d 242 (1974) (misdiagnosis of pregnancy); *Howard v. Lecher,* 42 N.Y.2d 109, 397 N.Y.S.2d 363, 366 N.E.2d 64 (1977) (failure to make test for Tay-Sachs disease in parents). It seems to us that these reasons ignore the judicial processes which daily meet other problems of equal difficulty and complexity with commendable results.

Prior to 1967, few courts had considered the question of whether the parents of an unplanned child could maintain an action against a physician for an improperly performed sterilization operation and, if so, the extent to which the compensatory damages were recoverable. The first of these cases was decided by the Minnesota courts in *Christensen v. Thornby,* 192 Minn. 123, 255 N.W. 620, 93 A.L.R. 570 (1934). In that case the plaintiff had undergone a vasectomy after his wife had experienced great difficulty in giving birth to her first child. When his wife subsequently became pregnant and delivered a healthy child, the plaintiff brought suit for his "anxiety and expenses" incident to the birth, claiming that the physician who had performed the vasectomy had deceived him into believing that the operation had been successful. The trial court sustained a demurrer to the complaint, and on appeal the trial court was upheld on the

abortion are not contrary to the public policy. Compare, *Wilczynski v. Goodman,* 73 Ill.App.3d 51, 29 Ill.Dec. 216, 391 N.E.2d 479 (1979).

ground that the plaintiff had failed to allege that the false representation was made with fraudulent intent sufficient to support his allegation of deceit. Apart from the technical disposition made in this case, it was expressly held that sterilizations were not contrary to public policy and that an action, if properly pleaded, could be maintained against a physician for the improper performance of such an operation.[18]

Viewed in its correct posture, the *Christensen* case stands solely for the proposition that a cause of action exists for an improperly performed sterilization. The more troublesome question of damages, once liability on the part of a physician is established, was neither raised nor directly considered. Nevertheless, the following dicta from the *Christensen* opinion was later relied on by other courts to preclude parents from recovering damages for the economic costs of an unplanned child:

". . . [T]he plaintiff has been blessed with the fatherhood of another child. The expenses alleged are incident to the bearing of a child, and their avoidance is remote from the avowed purpose of the operation. As well might the plaintiff charge defendant with the cost of nurture and education of the child during its minority." 192 Minn. at 126, 255 N.W. at 622, 93 A.L.R. at 572.

What the court said in *Christensen,* supra, was that since the claim of damages was remote from the avowed purpose of protecting plaintiff's wife against the dangers of pregnancy, he had suffered no damages since his wife was not in any way injured and gave birth to a healthy child.

*Christensen* is not the same as the instant case. *Christensen* is not a case where the parents did not want a child, but one that the husband didn't want his wife's life endangered by childbirth. Since the wife suffered no harm, a wrongful life claim was remote from the purposes of the husband's sterilization. The facts in our instant case are certainly far different from those in *Christensen.* Here plaintiff-parents did not want a child based on their deep-rooted and inextin-

18. See *Martineau v. Nelson,* 311 Minn. 92, 247 N.W.2d 409 (1976).

guishable fear that such a child would be born with the dreaded disease affecting its nervous system.

In the years which followed the *Christensen* case, courts and commentators developed several theories to support the view that as a matter of public policy, parents should not be permitted to recover damages for the birth of either a defective or a healthy child, even though the infant may have been unplanned or unwanted at the time of conception. In *Gleitman v. Cosgrove,* supra, the New Jersey appellate court, in a tort claim arising out of the wrongful birth of a defective child, affirmed a judgment dismissing the complaint filed on behalf of an infant and its parents against a physician for his failure to inform the then two-month pregnant mother with German measles that her condition could possibly adversely affect the health of her child on grounds of the non-existence of cognizable damages. The court said it was impossible to measure in damages the difference between the infant's life with defects against the utter void of non-existence. By claiming he should not have been born at all, the court added, the infant made it impossible to measure the damages as required by compensatory remedies and thus not cognizable in law. The *Gleitman* court also held that to allow damages for the mother's emotional stress in raising a child or for the father's claim that it would be less expensive to have had an abortion performed on his wife than the expense of raising the child, made necessary the weighing of the intangible, unmeasurable and complex human benefits of motherhood and fatherhood against the alleged emotional and monetary injuries, which the court said was impossible to do.[19]

19. See *Stills v. Gratton,* 55 Cal.App.3d 698, 127 Cal.Rptr. 652 (1976) (negligent abortion); *Coleman v. Garrison,* 349 A.2d 8 (Del.1976) (unsuccessful vasectomy); *Cox v. Stretton,* 77 Misc.2d 155, 352 N.Y.S.2d 834 (1975) (vasectomy); *Terrell v. Garcia,* supra, (unsuccessful vasectomy); *Howard v. Lecher,* supra. For the same result on mental distress and emotional disturbance see *Jacobs v. Theimer,* 519 S.W.2d 846 (Tex.1975). Since the time *Gleitman v. Cosgrove* was decided, however, the New Jersey Supreme Court has reevaluated its decision to the extent that the child still has no cause of action, the parents cannot recover for the expenses of raising the child, but

Although not all of the early cases considering the issue expressed such a hostile view toward the parents' cause of action, the first major case holding that parents have a right to recover damages, including the cost of rearing an unplanned child born by reason of negligent sterilization procedures by defendant-physicians, was decided by the California Court of Appeals in the case of *Custodio v. Bauer,* supra. The complaint was predicated on allegations of negligent performance of surgical procedures and medical advice and on breach of contract to successfully abort the plaintiff-wife. The trial court sustained the defendant's demurrer to the complaint and on plaintiffs' appeal the Court of Appeals reversed. The significance of the appellate decision, however, lies not in its holding that the plaintiffs' factual allegations were legally sufficient to state the several causes of action averred. The importance is in its decision on the extent of damages allowable, holding that the plaintiff-parents were entitled to not only costs arising out of the negligent medical procedures but to all costs which reasonably flowed from the negligence. The court in *Custodio* held that even if a woman survives the childbirth unharmed after a failed sterilization, there is still some loss which is compensable if the resultant additional child and change in family status can be measured economically. The court said that the birth of a child may be less than a blessing in an economically deprived family, particularly if the sterilization had been intended to prevent the birth of a physically defective or mentally retarded infant and that childrearing costs are not remote from the avowed purpose of an operation undertaken for the purpose of avoiding child-bearing. See discussion of *Troppi v. Scarf,* 31 Mich.App. 240, 187 N.W.2d 511 (1971); 36 U. of Miami L.R. at page 1415, allowing a modified view relating to damages under Section

the parents can recover for emotional and mental distress. *Berman v. Allan,* 80 N.J. 421, 404 A.2d 8 (1979). In his Concurring and Dissenting Opinion, Judge Spaeth relies on the *Berman* case. If Judge Spaeth were to be consistent with that case, however, he would also deny recovery to the parents since that is the result reached in *Berman.*

920, Restatement (Second) of Torts.[20] In *Troppi*, supra, a pharmacist misfilled a prescription for an oral contraceptive; this mistake resulted in Mrs. Troppi's pregnancy and the birth of a healthy child. The court held that damages claimed by the parents were not unduly speculative, but within the scope of the generally applicable rule as to damages in tort actions, namely, that a tort-feasor is liable for all injuries resulting directly from his wrong acts, irrespective of whether they could have been foreseen by him, provided the damages are the legal and natural consequences of the wrong action imputed to the defendant. The *Troppi* court said that the difficulty in determining the amount to be deducted from gross damages under the benefit rule of § 920 would not justify "throwing up our hands and denying recovery altogether."

A number of courts have allowed recovery by parents for damages proximately caused by the physician's negligence, including the cost of rearing a healthy child during his minority. These courts have ordinarily required that damages be reduced by any benefits conferred by the child through an application of the "benefit rule," Section 920 Restatement (Second) of Torts. *Sherlock v. Stillwater Clinic,* 260 N.W.2d 169 (Minn.1977); *Dumer v. St. Michael's Hospital,* 69 Wis.2d 766, 233 N.W.2d 372, 83 A.L.R.3d 1 (1975) (failure to diagnose rubella). In *Dumer,* supra, the Supreme Court decided that parents were entitled to recover damages for the birth of an unplanned child arising out of a negligently performed vasectomy. The court permitted the parents to recover reasonably foreseeable costs for the rearing of the child, offset by the value of benefits from the child.

---

**20.** Section 920 provides: "Where the defendant's tortious conduct has caused harm to the plaintiff or to his property and in so doing has conferred upon the plaintiff a special benefit to the interest which was harmed, the value of the benefit conferred is considered in mitigation of damages; where this is equitable." It was held that the benefits of the unplanned child may be weighed against all elements of claimed damage, including the medical expenses incident to the birth. Accordingly, the court in *Troppi* reversed the order that had dismissed the complaint and remanded the case for trial on the merits.

The court limited damages attributable to deformities of the child as contrasted to those expenses which would be incurred for a normal child. In *Stillwater*, the court permitted the parents to recover reasonably foreseeable costs of rearing the child in conformity with § 92, Restatement of Torts, supra.[21]

In other cases which recognize plaintiffs' right to claim damages, no specific limitations were placed on the amount of recovery allowable for the raising of the child. *Ziemba v. Sternberg*, 45 A.D.2d 230, 357 N.Y.S.2d 265 (1975). In *Ziemba*, the court left the damages to be proved at trial and refused to apply the balancing test of the joy of parenthood against the cost of rearing the child, since in the court's view it had no relevancy as an issue on the basis of plaintiffs' complaint. In *Betancourt v. Gaylor*, 136 N.J.Super. 69, 344 A.2d 336 (1975) (negligent sterilization) the court held it was possible for parents to recover all damages and did not note any offsetting limits. In *Betancourt*, the court distinguished the earlier New Jersey case of *Gleitman v. Cosgrove*, supra, on factual grounds. In *Gleitman*, the plaintiff-wife was denied relief because there was no evidence that she did not want a child, the only concern being that she didn't want a deformed child. In *Betancourt*, the plaintiff didn't want a child. This is the crux of the instant case. Plaintiff-parents did not want a child because of their fear it would be born with a dread disease.[22]

The most recent cases agree that the parents have a right in "wrongful birth" cases to claim and recover damages at trial for child-care costs arising out of the physicians' negligence. Forty-three years after the Minnesota case of *Chris-*

---

**21.** For similar results, see *Stills v. Gratton*, supra, (negligent abortion); *Anonymous v. Hospital*, 33 Conn.Sup. 126, 366 A.2d 204 (1976) (negligent sterilization); *Bowman v. Davis*, supra.

**22.** See *Jackson v. Anderson*, 230 So.2d 503 (Fla.App.1970), where the court held that parents' cause of action for "wrongful life" will lie and damages are a matter for jury determination. See also *Bishop v. Byrne*, 265 F.Supp. 460 (S.D.W.Va.1967) (wrongful sterilization); *Rivera v. New York*, 46 U.S.L.W. 2586 (1978); *Gildiner v. Thomas Jefferson U. Hosp.*, 451 F.Supp. 692 (E.D.Pa.1978).

tensen v. Thornby, supra, was decided, the Minnesota Supreme Court held in Sherlock v. Stillwater Clinic, supra, that parents had set forth a legally cognizable cause of action in a "wrongful life" case arising out of a negligent vasectomy. In the case of Karlsons v. Guerinot, 57 A.D.2d 73, 394 N.Y.S.2d 933 (1977), it was held that parents had a right of recovery in the case of an alleged negligent abortion procedure resulting in the birth of a mongoloid child. See Ziemba v. Sternberg, supra; Martineau v. Nelson, supra, Rivera v. State, 46 U.S.L.W. 2586 (1978). Likewise, in Becker v. Schwartz, 46 N.Y.2d 401, 413 N.Y.S.2d 895, 386 N.E.2d 807 (1978), the doctor was allegedly negligent for not advising the mother of the risk of Downs Syndrome in children born to women of 35 years of age. Similarly in Park v. Chessin, id., the doctor was charged with negligence for telling the parents that the chance of their conceiving a second child inflicted with polycystic kidney disease was "practically nil." The Park case is similar to the instant one, as it relates to the unequivocal assurance of the doctors that their sterilization procedures were successful.

■ Based on the above discussion, there is no paucity of cases as they apply to Dr. Finegold, the urologist, or to Dr. Schwartz, the obstetrician and gynecologist, which hold that a cognizable cause of action at law exists for recovery of damages on the part of the parents in "wrongful life" cases. It is not contended by plaintiffs that defendant-physicians' treatment of Mr. Speck in the sterilization procedure caused the abnormalities in their infant.[23] But only that had plaintiffs been properly treated and cared for, their child would not have been conceived or born or if they had been sufficiently advised of the possibility of failed sterilization procedures they could have terminated the pregnancy within a prescribed time period by alternative methods of relief.[24]

---

**23.** See Sylvia v. Gobeille, 101 R.I. 76, 220 A.2d 222 (1966) (sustaining cause of action based on failure to prescribe drugs during pregnancy); cf. Jorgensen v. Meade Johnson Labs Inc., 483 F.2d 237 (10th Cir. 1973) (sustaining cause of action based on injurious oral contraceptives).

**24.** See Roe v. Wade, supra.

This principle is included in plaintiff-parents' claim for breach of contract and misrepresentation. In the last analysis and evaluation, and irrespective of the category of claims made, we hold plaintiffs' complaint sounds essentially in negligence, tortious breach of contract, and/or medical malpractice. As in any cause of action based on these grounds, a successful plaintiff must demonstrate the existence of a duty, the breach of which may be considered the proximate cause of damages suffered by the injured parties. See Restatement of Torts (Second) § 281; Prosser, *Law of Torts*, § 30 (4 ed.). This case is predicated, primarily, on the doctors' assurances we accept as true based on defendant's demurrers.

Once the plaintiff has carried this burden, it is axiomatic that the tort-feasor is liable for all damages which ordinarily and in the natural course of things have resulted from the commission of the tort.

In the instant case, we deny Francine's claim to be made whole. When we examine Francine's claim, we find regardless of whether her claim is based on "wrongful life" or otherwise, there is a failure to state a legally cognizable cause of action even though, admittedly, the defendants' actions of negligence were the proximate cause of her defective birth. Her claims to be whole have two fatal weaknesses. First, there is no precedent in appellate judicial pronouncements that holds a child has a fundamental right to be born as a whole, functional human being. Whether it is better to have never been born at all rather than to have been born with serious mental defects is a mystery more properly left to the philosophers and theologians, a mystery which would lead us into the field of metaphysics, beyond the realm of our understanding or ability to solve. The law cannot assert a knowledge which can resolve this inscrutable and enigmatic issue. Second, it is not a matter of taking into consideration the various and convoluted degrees of the imperfection of life. It is rather the improbability of placing the child in a position she would have occupied if the defendants had not been negligent when to do so would

make her nonexistent. The remedy afforded an injured party in negligence is intended to place the injured party in the position he would have occupied but for the negligence of the defendant. Thus, a cause of action brought on behalf of an infant seeking recovery for a "wrongful life" on grounds she should not have been born demands a calculation of damages dependent on a comparison between Hobson's choice of life in an impaired state and nonexistence. This the law is incapable of doing.[25]

Finally, we hold that the impossibility of this suit as to Francine comes not so much from the difficulty in measuring the alleged damages as from the fact, unfortunately, that this is not an action cognizable in law. Thus, the recognized principle, not peculiar to traditional tort law alone, that it would be a denial of justice to deny all relief where a wrong is of such a nature as to preclude certain ascertained damages, is inapposite and inapplicable here. Accordingly, plaintiffs' complaint insofar as Francine's claim for damages for "wrongful life" is concerned, does not present a legally cognizable action at law.

Although we deny Francine's claim, we hold recovery is allowed in the parents' claim in this case. Here there is no dispute the pleadings allege the existence of a duty flowing from the defendant-physicians to themselves, the breach of which resulted in the birth of Francine. The alleged negligence and misrepresentations of both doctors and by the alleged breach of contract by Dr. Finegold has also been adequately pleaded. Unlike Francine's claim based on "wrongful life," plaintiff-parents' causes of action allege in traditional tort language that but for defendants' breach of duty to properly treat and advise plaintiff-parents they would not have been required to undergo the expenditures alleged. In these allegations plaintiff-parents set

25. See *Berman v. Allan,* supra; *Smith v. United States,* 392 F.Supp. 654 (N.D.Ohio 1975); *Stewart v. Long Island College Hospital,* supra; *Gleitman v. Cosgrove,* supra; *Gildiner v. Thomas Jefferson University Hospital,* supra; *Elliott v. Brown,* supra.

forth a duty owed to them by the doctors and breached by the doctors with resulting injuries to the plaintiffs.[26]

As to the emotional disturbance and mental stress claimed by plaintiff-parents due to the fact of Francine's birth, we hold these claims must be denied. In allowing recovery in favor of parents for pecuniary losses resulting from physicians' negligence in a "wrongful birth" case, the court in the case of *Park v. Chessin* and *Becker v. Schwartz,* supra, said:

"Of course, this is not to say that plaintiffs may recover for psychic or emotional harm alleged to have occurred as a consequence of the birth of their infants in an impaired state. The recovery of damages for such injuries must of necessity be circumscribed." [27]

Unlike the measurability of pecuniary loss, to which plaintiff-parents are entitled, there is no legal realm of accountability to which they can look for claimed mental and emotional damages arising out of the birth of their child which could factually place them in a more favorable category than parents who generally, in the vicissitudes and vagaries of life, face the everyday potential of pain and suffering in the raising of their children. It is not possible to distinguish the mental and emotional travail which plaintiffs claim here from the pain and suffering of parents who raise a retarded child or whose infant is born blind or mongoloid or falls heir to one of the countless natural diseases or being healthy becomes permanently injured, disfigured or handicapped by reason of accident. The fact that plaintiffs did not want Francine does not alter the sameness in the quality and

26. See Footnote 7, supra, on physicians' duties which arise solely out of force of law as distinguished from specific contracts entered between patient and physician.

27. 46 N.Y.2d at 413, 413 N.Y.S.2d at 901, 386 N.E.2d at 813. See discussion in *Howard v. Lecher,* supra, and *Johnson v. State,* 37 N.Y.2d 378, 372 N.Y.S.2d 638, 334 N.E.2d 590 (1975), in which different results were reached regarding recovery for emotional and mental stress. However, the court in *Park v. Chessin* and *Becker v. Schwartz* reconciled these cases in excluding recovery for emotional and mental damages in "wrongful birth" cases. Compare *Berman v. Allan,* supra.

nature of pain and suffering experienced in the everyday work of parenthood.

In his Concurring and Dissenting Opinion, Judge SPAETH states that, "[t]he majority says that many people have children who are unwanted for the same reasons, but with no negligence involved, and that their emotional and mental anguish is identical to that of the Specks." This is a misinterpretation of our position. Although the Specks feared the hereditary disease and economic hardships another child might bring, our denial of their recovery in no way means that all parents of "unwanted" children suffer the same stress. To the contrary, our position is that all parents suffer some degree of stress, especially if a child is born with a disabling condition. However, not all of these children are "unwanted" in any sense of that term, and the emotional anguish they suffer may be a normal, uncompensable price one pays for being a parent. Therefore, to allow plaintiffs' claim for mental and emotional stress would be to give them a societal advantage not conceivable in other cases of parenthood.

Order of the lower court affirmed in part, reversed in part and remanded for trial on the merits under the legal theories of tort and assumpsit as more specifically set forth in this opinion.

PRICE, J., files a concurring and dissenting opinion.

SPAETH, J., files a concurring and dissenting opinion.

JACOBS and VAN der VOORT, JJ., did not participate in the consideration or decision of this case.

PRICE, Judge, concurring and dissenting:

The instant appeal arises from a background accurately set forth in the majority opinion. The original complaint contains five counts, in both trespass and assumpsit. It appears to this writer that to clearly appreciate the scope of our decision, it is necessary to address the appeal on a count by count basis; such an analysis is indeed necessary to delineate those areas in which I dissent from the majority.

The first count in the complaint includes claims by appellant parents against appellee Finegold, while the second count contains the identical claims against appellee Schwartz. Both counts contain the traditional allegations of negligence, and in that respect the pleadings appear to be proper.[1] The difficulty arises, however, with respect to the damage claims contained in paragraphs 10 and 11 of the first count and paragraphs 20 and 21 of the second count.[2]

These counts contain, on behalf of each parent, a claim of damages for the past, present and future costs and expenses of rearing an additional child. It is this item of recovery, if the majority opinion is being properly interpreted by this writer, that the majority permits by the sweeping statement: "the tort-feasor is liable for all damages which ordinarily and in the natural course of things have resulted from

1. Both Finegold and Schwartz filed motions to strike alleging that appellants had combined claims by both Frank Speck and Dorothy Speck in the same count contrary to Pa.R.C.P. No. 1020(b), 2228(a), and failed to set forth separate counts for their claims arising in trespass and assumpsit contrary to Pa.R.C.P. No. 1020(d)(1). The court below sustained appellees' motions, and leave was granted to permit the Specks to amend their complaint.

2. A summary of the individual damages claimed by appellants in paragraphs 10, 11, 20 and 21 is as follows:
For Frank Speck:
1. expenses in connection with the performance of the bilateral vas ligation;
2. pain and inconvenience resulting from the bilateral vas ligation;
3. loss of consortium during the period of his wife's pregnancy, child birth, and post natal recuperation, and care;
For Dorothy Speck:
1. pain, inconvenience and mental anguish as a result of the pregnancy, child birth and post natal care and treatment.
A list of the damages claimed by both appellants is as follows:
1. expenses in connection with the attempted abortion;
2. expenses in connection with the pregnancy of Mrs. Speck;
3. expenses in connection with the raising of an additional child;
4. expenses in connection with the medical attention, treatment and care of the additional child;
5. emotional distress and physical and mental anguish resulting from the raising of an additional child;
6. mental anguish and emotional distress resulting from the birth of a defective and diseased child.

the commission of the tort." (At 508). It is from the allowance of that item that I most vigorously dissent.

I agree with the general proposition that public policy and social necessity mandate a holding that the birth of *any* child is not a wrong that results in "damage" to the parents, regardless of the theory or form of pleading. Although the majority finds error in the decision of the lower court on this issue, I consider that decision perfectly proper. The allowance of such an item of recovery will, I submit, have no sensible or just stopping place. The law and the courts generally are not equipped, nor do I consider them competent, to enter into this complex, intangible weighing of the parenthood of *any* child. The issue has been addressed by writers, both legal and social, over the years. The opinion of the majority, as well as the comprehensive opinion by the Honorable Silvestri Silvestri of the Court of Common Pleas of Allegheny County, summarizes these cases and arguments. An additional recounting of those authorities is here unnecessary. My decision differs from the majority as to the propriety of permitting recovery for the expense and cost of raising this additional child.

Counts one and two also include a claim for special damages occasioned by the need to raise a defective child. The mysteries of life are such that no parent is guaranteed the birth of a perfectly healthy child. For the same reasons as stated above, I cannot agree that this claim states a recognizable item of damages.

Also included in the first and second counts are the claims for emotional distress, mental anguish and physical inconvenience of both parents occasioned by the birth and necessity of raising a defective child. I concur with the majority in the disallowance of these claims.

The remaining claims for damages under counts one and two are the traditional direct damages caused by the failure of the vas ligation and abortion. I concur with the majority that these items are properly recoverable.

The third count is simply a reiteration of the first and second and need not be further discussed.

The fourth count is the claim of the child, Francine, for, *inter alia*, pain and suffering and medical expenses. I concur in the conclusion of the majority that this claim must be denied. I must comment, however, that the rationale adopted by the majority in this regard appears inconsistent with their willingness to consider basically the same "mysteries" of life in permitting the parents to recover the added expense and cost of raising this child.

The fifth count has been withdrawn and need not be discussed.

I would affirm the order of the Court of Common Pleas of Allegheny County.

SPAETH, Judge, concurring and dissenting:

I agree with the majority that the daughter, Francine, has no cause of action against appellees, and I also agree with the majority that as Francine's parents, Frank and Dorothy Speck have a cause of action for their expenses attributable to the birth and raising of Francine. I disagree with the majority, however, on the Specks' right to recover damages for the emotional distress and physical inconvenience attributable to Francine's birth; I should allow such damages.[1]

–1–

In deciding whether Francine has a cause of action against appellees, it may be helpful first to note that the facts of this case differ markedly from other plausible fact situations that might give rise to a cause of action on the part of an infant. One can imagine a situation in which a defendant's negligence caused physical damage to a fetus with the result that the infant was born diseased or deformed. Negligent administration of the drug Thalidomide, for example, could cause such a deformity in an otherwise healthy infant. Indeed, in *Sinkler v. Kneale*, 401 Pa. 267,

1. On appeal from an order sustaining preliminary objections in the nature of a demurrer, we must take as true all material facts well pleaded in the complaint and all inferences fairly deducible from those facts. *Yania v. Bigan*, 397 Pa. 316, 155 A.2d 343 (1959); *Springer v. Springer*, 255 Pa.Super. 35, 386 A.2d 122 (1978).

164 A.2d 93 (1960), the Supreme Court sanctioned just such a cause of action, where the infant plaintiff claimed that negligence before its birth caused it to be born suffering from mongolism. One can also imagine a situation in which a defendant negligently failed to treat a condition that was treatable *in utero*, with, again, the result that an otherwise healthy infant was born diseased or deformed. *See, Sylvia v. Gobeille*, 101 R.I. 76, 220 A.2d 222 (1966) (sustaining cause of action for failure to administer drug to prevent mother from catching German measles (rubella) after she had been exposed to the disease). In both of these situations, but for the defendant's negligence the infant would have been born healthy. I see no reason based on logic or policy why such an infant could not assert a cause of action.[2]

Here, the case is different. Appellees did not in any way contribute to Francine's disease. It was a hereditary disease; Francine never had the possibility of being born healthy, as the infants in the situations just imagined had. Her only alternatives were either never to be born, or to be born with the disease. In essence, her claim is that appellees, through their negligence, forced upon her the worse of these two alternatives.

In deciding whether this claim constitutes a cause of action in tort, it is important to consider what are the elements of a cause of action. These are: the existence of a legally recognized duty to protect others against unreasonable risk; a breach of that duty resulting in an injury; and a causal connection between the breach and the injury. Prosser, *Law of Torts*, § 30 (4th ed. 1971). Here, there can be no doubt that appellees owed a duty to Francine, even before she was born.[3] Furthermore, assuming that Francine

---

**2.** I should therefore modify the majority's statement that no one has "a fundamental right to be born as a whole, functional human being." at 508. One does have such a right, in the sense of a right to have one's physical integrity unimpaired by someone's negligence.

**3.** *Sinkler v. Kneale, supra*, establishes that an infant has standing to sue in Pennsylvania for injuries occurring prenatally. Nothing in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973),

was injured by being born to suffer from her disease—and whether she was is the critical issue, which I shall discuss—there can be no doubt that appellees breached their duty to her and that the breach caused her injury, for without appellees' negligence, Francine would not have been born.

It is the answer to the question of whether Francine suffered an "injury," as the law uses that term, that leads me to the conclusion that she has no cause of action against appellees. As mentioned, in essence she claims that nonexistence—never being born—would have been preferable to existence in her diseased state. But no one is capable of assessing such a claim. When a jury considers the claim of a once-healthy plaintiff that a defendant's negligence harmed him—for example, by breaking his arm—the jury's ability to say that the plaintiff has been "injured" is manifest, for the value of a healthy existence over an impaired existence is within the experience of imagination of most people. The value of nonexistence—its very nature—however, is not. If it were possible to approach a being before its conception and ask it whether it would prefer to live in an impaired state, or not to live at all, none of us can imagine what the answer would be. We can only speculate or refer to various religious or philosophical beliefs. We cannot give an answer susceptible to reasoned or objective valuation.[4] In *Becker v. Schwartz*, 46 N.Y.2d 401, 413 N.Y.S.2d 895, 386 N.E.2d 807

decided after *Sinkler*, prevents a state from giving legal status to a fetus where no countervailing privacy right of the mother is involved.

**4.** The inability to evaluate the merits of existence and nonexistence—not nonexistence before birth but after death—was discussed—and resolved in favor of existence—in the familiar "To be or not to be" soliloquy in *Hamlet*:

Who would fardels [burdens] bear,
To grunt and sweat under a weary life,
But that the dread of something after death,
The undiscovered country, from whose bourn
No traveller returns, puzzles the will,
And makes us rather bear those ills we have
Than fly to others that we know not of?
Thus conscience does make cowards of us all [.]

Shakespeare, *Hamlet*, III. i. 76–83 (Pelican ed., 1968).

(1978), in which a similar cause of action was denied, Judge FUCHSBERG, concurring, said:

Who then can say . . . that, had it been possible to make the risk known to the children-to-be—in their cellular or fetal state, or, let us say, in the mind's eye of their future parents—that the children too would have preferred that they not be born at all?

To ordinary mortals, the answer to the question obviously is "no one." Certainly the answer does not lie in the exercise by the children, if their mental conditions permit, of subjective judgments long after their births.

*Id.,* at 416, 413 N.Y.S.2d at 903, 386 N.E.2d at 815. *Accord, Berman v. Allan,* 80 N.J. 421, 404 A.2d 8 (1979). In *Roe v. Wade, supra,* the United States Supreme Court said that its "task . . . [was] to resolve the issue by constitutional measurement, free of emotion and of predilection." *Id.,* 410 U.S. at 116, 93 S.Ct. at 709. Here, similarly, our task is to resolve the issue by settled principles of common law. Doing so, I find that although Francine is obviously suffering greatly from her disease, and although her suffering can only cause one sorrow, it is impossible to say that appellees' negligence—assuming it were proved—caused her the sort of "injury" that the law finds compensable.[5]

–2–

There is no such impossibility of comprehension, however, impeding the effort of Francine's parents to recover damages in connection with Mr. Speck's vasectomy, Mrs. Speck's abortion, the loss of Mrs. Speck's companionship and services, and for the expenses attributable to the birth and raising of a child, and, more particularly in this case, a child

**5.** Thus I do not reach the issue, which many courts, *e. g., Gleitman v. Cosgrove,* 49 N.J. 22, 227 A.2d 689 (1967), as well as the majority opinion, at 508, have found dispositive, of the possibility or impossibility of calculating the damages Francine would be entitled to. Notably in *Berman v. Allan, supra,* the New Jersey Supreme Court said that the problem of damages was not "our sole or even primary concern," 80 N.J. 421, 404 A.2d 8 as it had been in *Gleitman.* Instead, the court decided the question on the absence of legally cognizable injury, as discussed *supra.*

who will need a good deal of special care, training, and medical treatment. The Specks in their complaint alleged that they had decided to have no more children, for two reasons: economic hardship and their fear of the hereditary disease. The birth of Francine represented the realization of both those fears.[6] The birth thus is a direct and foreseeable result of appellees' negligence, and the extent of the damages is similarly direct and foreseeable. I should permit the jury to be instructed, however, that it could reduce these damages by an amount representing the benefit that a child—healthy or unhealthy—would bring to the parents.[7] Restatement of Torts (Second), § 920. The majority opinion, at 506–507, discusses cases in which the "benefit rule" has been applied, but does not actually say whether it would apply the rule or not. If the majority's statement that "the tort-feasor is liable for all damages which ordinarily and in the natural course of things have resulted from the commission of the tort," id., at 508, is meant to imply that the damages could not be diminished by the benefits, I disagree.

–3–

I disagree with the majority on the Specks' right to recover damages for the emotional distress and physical inconvenience attributable to Francine's birth. As just stated, the Specks have alleged that they did not want another child because of economic hardship and their fear of the hereditary disease. The majority says that many people

**6.** I should leave undecided the outcome in a case in which a child that resulted from the defendant's negligence had been unwanted because its birth presented a risk that in the end did not materialize. For example, it might be that a couple desired no more children because they feared a risk to the mother's health in childbirth, or, as here, a hereditary disease. If a child was because of the defendant's negligence nevertheless born, but with no damage to the mother's health and itself healthy, arguably the damages should not include the expenses of raising the child. Cf. Wilczynski v. Goodman, 73 Ill.App.3d 51, 29 Ill.Dec. 216, 391 N.E.2d 479 (1979).

**7.** This jury instruction should alleviate the concern of the court in Berman v. Allan, supra, which held that the costs of child-rearing were not allowable because the award would be disproportionate to the culpability involved, a windfall to the parents, and too unreasonable a financial burden on the physician. 80 N.J. 421, 404 A.2d 8.

have children who are unwanted for the same reasons, but with no negligence involved, and that their emotional and mental anguish is identical to that of the Specks. I confess I am puzzled by this reasoning,[8] which ignores the fact that a similar objection could be made in almost any tort case. The right to damages is not defeated by the fact that other persons may suffer them. In an automobile crash case, for example, a jury might find either that one party was negligent, or that no negligence was involved, that is, that both drivers had exercised the care of a reasonable person but that the accident had occurred nonetheless. Similarly, a tree limb might fall on someone; a jury might find either that this was because the landowner had been negligent in not trimming the tree, or because it was a freak accident involving no negligence. In each case, it makes no difference to the injured person that negligence was or was not involved; his physical injury and consequent emotional distress are the same. Yet where negligence is involved, such damages are compensated. Where negligence is not involved, the identical damages are not compensated. This case presents no reason to change this standard analysis, nor does the majority suggest any reason. If it is proved that appellees were negligent, the emotional distress consequent upon the materialization of exactly the risks that appellants feared would be the direct result of appellees' negligence, and recovery should be permitted.[9] *Berman v. Allan, supra.*

**8.** The majority quotes from *Becker v. Schwartz, supra,* where the court determined that "[t]he recovery of damages for such injuries [emotional distress] must of necessity be circumscribed." At 509. However, the "necessity" of which the New York court spoke was simply New York case precedent to the contrary, which the court viewed as binding. 46 N.Y.2d at 413, 413 N.Y.S.2d at 901, 386 N.E.2d at 813. Judge WACHTLER, in dissent, noted that if the court was granting the parents' right to recover the costs of raising the children—and he argued that even that recovery violated New York case precedent—then there was no reason not to allow damages for emotional distress too. *Id.,* at 420, 413 N.Y.S.2d at 906, 386 N.E.2d at 818.

**9.** The majority refers to the contrasting "measureability of pecuniary loss." At 509. There is no elaboration on this point; surely, however, the majority does not find the claimed damages for emotional

Accordingly, I should affirm the lower court's order as to Francine's cause of action, and should reverse and remand for trial on Frank and Dorothy Speck's causes of action.

distress less measurable here than such damages are in any other case in which their recovery is routinely allowed.