Charles J. Beckihella, J.
In this lawsuit, the complaint states three causes of action, the first on behalf of an infant girl soon to be four years of age, the second on behalf of the infant’s mother, and the third on behalf of the infant’s father.
Each of the three causes of action has its origin in the circumstance that in June, 1964, the defendant hospital, acting through physicians on its staff, declined to terminate the pregnancy of the plaintiff mother which preceded the birth of the infant plaintiff.
The plaintiff mother was a patient in the defendant hospital for about six days in June, 1964. She entered the hospital as a result of advice given her by her family physician, he having had forebodings that the child, the plaintiff mother was carrying would be born with congenital disabilities as a result of the mother having become afflicted with rubella (German measles) early in her pregnancy.
During the several days the mother was confined to the defendant hospital, her case Mstory was reviewed by four physicians who were members of the hospital committee that had the responsibility of deciding whether or not the plaintiff mother’s pregnancy should be terminated. Two of the four doctors were of the opinion that an abortion should be performed. Two were of the opinion that no abortion should be performed. The final result was that no abortion was performed. Thereafter, the plaintiff mother gave birth to the infant plaintiff. That unfortunate child suffers serious physical and mental disabilities that will handicap her for the rest of her life.
(a) The first cause of action.
In this cause of action, the infant, suing by her father, alleges that she was seriously injured as a result of the defendant hospital’s negligence. Inter alia, the infant alleges that she was born with birth defects “ which were either caused or which could have been prevented by the defendant ” had it acted *434 prudently; that the birth defects were caused by the defendant’s negligence and malpractice; that the defendant was negligent in “ failing to carry out the indicated and necessary therapeutic abortion.”
There was no proof of any kind adduced at the trial of this action which supports the allegations in the complaint that the defendant hospital caused the infant’s birth defects. Nor was there any proof that the infant’s disabilities could have been prevented by the hospital. The proof adduced demonstrated beyond any doubt that the infant’s birth defects were the consequence of the child’s mother having contracted rubella (German measles) during the early stages of her pregnancy.
The proof showed that the only way the infant could have been spared being born with birth defects was not to have been born at all. This leads to the question central to the first cause of action, namely, must the defendant hospital respond in damages to the infant plaintiff because the hospital declined to terminate the pregnancy of the infant plaintiff’s mother. There is scant authority on this question, that this court is aware of, in New York or any other jurisdiction.
There is one decision of the Supreme Court of New Jersey that is squarely in point. That decision, Gleitman v. Cosgrove (49 N. J. 22) involved an infant who was born with serious birth defects after his mother had contracted rubella (German measles) during her pregnancy. The mother testified that the defendant physician (p. 24) “ told her that the German measles would have no effect at all on her child.” Five of the seven Justices of the New Jersey Supreme Court who participated in the Gleitmcm decision held that the Trial Judge was correct in dismissing the complaint of the infant plaintiff at the close of the plaintiffs’ case. Four Justices joined in the majority opinion; the Chief Justice who dissented in part from the majority opinion agreed with the majority that the claim advanced on behalf of the infant “ cannot be maintained ” (49 N. J. 22, 63).
The majority opinion, as a kind of preface to holding that the first count of the complaint on behalf of the infant Jeffrey Gleitman “ is not actionable because the conduct complained of, even if true, does not give rise to damages cognizable at law,” stated (pp. 28-29) :
“ The infant plaintiff is therefore required to say not that he should have been born without defects but that he should not have been born at all. In the language of tort law he says: but for the negligence of defendants, he would not have been born to suffer with an impaired body. In other words, he claims that the conduct of defendants prevented his mother from obtaining *435 an abortion which would have terminated his existence, and that his very life is 1 wrongful.’
“ The normal measure of damages in tort actions is compensatory. Damages are measured by comparing the condition plaintiff would have been in, had the defendants not been negligent, with plaintiff’s impaired condition as a result of the negligence. The infant plaintiff would have us measure the difference between his life with defects against the utter void of nonexistence, but it is impossible to make such a determination. This Court cannot weigh the value of life with impairments against the nonexistence of life itself. By asserting that he should not have been born, the infant plaintiff makes it logically impossible for a court to measure his alleged damages because of the impossibility of making the comparison required by compensatory remedies. As a recent commentator put the matter:
“ ‘ [N]o comparison is possible since were it not for the act of birth the infant would not exist. By his cause of action, the plaintiff cuts from under himself the ground upon which he needs to rely in order to prove his damage. ’ Tedeschi, ‘ On Tort Liability for “ Wrongful Life”,’ 1 Israel L. Rev. 513, 529 (1966).
‘1 The two cases from other states which have considered the theory of action for ‘ wrongful life ’ were brought by illegitimate children for damages caused by their birth out of wedlock, and in both cases policy reasons were found to deny recovery. Zepeda v. Zepeda, 41 Ill. App. 2d 240, cert. den. 379 U. S. 945; and Williams v. State of New York, 18 N Y 2d 481.”
The New York decision referred to, Williams v. State of New York, is not squarely in point, but does have implications that point the way to the answer to the question raised by the first cause of action in the instant action. In Williams, the Court of Appeals affirmed the dismissal of the claim of an infant who alleged that the State had been negligent in caring for the infant’s mother while the mother was a patient in a State hospital for the mentally ill. The infant contended that the State had negligently failed to protect her mother 11 from attack and harm from others, which negligence resulted in the infant Christine Williams being conceived, being born and being born out of wedlock to a mentally deficient mother.” The damages alleged to have been suffered by the infant were that she was “ deprived of property rights; deprived of a normal childhood and home life; deprived of proper parental care, support and rearing; caused to bear the stigma of illegitimacy.” In affirming the dismissal of the infant’s action, the Court of Appeals stated: 11 To uphold the present claim would be to say that being born *436 out of wedlock in itself gives a right to damages and that the damages include compensation for the (supposed or possible) disadvantages of illegitimate birth ” (18 N Y 2d 481, 483-484). Continuing, the court stated: “ Impossibility of entertaining this suit comes not so much from difficulty in measuring the alleged ‘ damages ’ as from the absence from our legal concepts of any such idea as a ‘ wrong ’ to a later-born child caused by permitting a woman to be violated and to bear an out-of-wedlock infant. If the pleaded facts are true, the State was grievously neglectful as to the mother, and as a result the child may have to bear unfair burdens as have many other sons and daughters of shame and sorrow. But the law knows no cure or compensation for it, and the policy and social reasons against providing such compensation are at least as strong as those which might be thought to favor it. Being born under one set of circumstance rather than another or to one pair of parents rather than another is not a suable wrong that is cognizable in court. The farthest reach of our law is to paternity proceedings (see Family Ct. Act) and that was accomplished by statute.”
In Zepeda v. Zepeda (41 Ill. App. 2d 240), the Illinois decision referred to above, an illegitimate son sued his father “ for the deprivation of his right to be a legitimate child, ’ ’ and for other corollary consequences of his illegitimate birth. The complaint was dismissed.
This court has reached the conclusion that the first cause of action must be dismissed. There is no remedy for the only facts proved by the plaintiff in support of this cause of action. The three decisions referred to above demonstrate that there is no remedy for having been born under a handicap, whether physical or psychological, when the alternative to being born in a handicapped condition is not to have been born at all. To put it another way, a plaintiff has no remedy against a defendant whose offense is that he failed to consign the plaintiff to oblivion. Such a cause of action is alien to our system of jurisprudence.
The rationale of our law of torts is to compensate individuals who have suffered a diminution of their faculties, temporarily or permanently, as a result of a defendant’s carelessness. The gravity of a defendant’s wrong is measured by the extent to which his conduct has put the plaintiff in a handicapped condition. The ultimate wrong that can be committed is to cause another person’s death. It would be the antithesis of these principles to require the defendant hospital to respond in damages to the infant plaintiff because it did not prevent the infant’s birth.
*437 The defendant hospital clearly had the right to refuse to terminate the plaintiff mother’s pregnancy. In June, 1964, when she was a patient in the defendant hospital, section 80 of the former Penal Law made it the felony of abortion to procure the miscarriage of a woman “ unless the same is necessary to preserve the life of the woman, or of the child with which she is pregnant ”. (There was no proof at the trial that the plaintiff mother’s life was in danger at any time.)
Neither section 80 nor any other section of the former Penal Law was ever cited to the plaintiff mother as a reason for not terminating her pregnancy. There was testimony that many pregnancies were terminated in the defendant hospital, and it was conceded that careful consideration was given to terminating the plaintiff mother’s pregnancy, but there was not even an intimation on the part of anyone connected with the defendant hospital that the hospital was relying on section 80 of the former Penal Law when it declined to terminate the plaintiff mother’s pregnancy. The indicated reason for the hospital’s decision not to act was the decision of its committee that there was not the requisite proof that the plaintiff mother had indeed suffered from rubella (German measles). The hospital could have placed total reliance on section 80 of the former Penal Law, for it would have no right to ignore the clear mandate of the Legislature as expressed in section 80. (b) The second cause of action:
The jury returned .a verdict, in the sum of $10,000, in favor of the plaintiff mother on this cause of action.
In an effort to ascertain the exact thinking of the jury with respect to this cause of action, the court submitted three questions to the jury.
The first question: “ Did a doctor in the defendant hospital tell Mrs. Stewart that she did not need a therapeutic abortion?” The jury answered “ Yes ” to this question.
The second question: “ Did a doctor in the defendant hospital tell Mrs. Stewart that she should not seek an abortion elsewhere?” Again, the jury answered “ Yes
The third question: ‘ ‘ Did a doctor in the defendant hospital tell Mrs. Stewart that the baby would be born normal?” The jury’s answer to this question was “ No ”.
There is no merit to the defendant’s contention that the answer to the third question is inconsistent with the other two answers. The defendant logically could have assured the plaintiff she did not need an abortion while stopping short of an assurance that her child would be normal.
The jury’s affirmative answers to the first two questions set out above are based on proof of very questionable credibility. *438 The plaintiff mother’s description of the doctor who is supposed to have reassured her was vague, indecisive and not supported by the testimony of anyone else. If this court were the trier of the facts, it would have rejected the plaintiff mother’s testimony and would have answered all three questions in the negative. However, the court did not determine the facts and would not be warranted in setting aside the jury’s answers to the questions submitted to them.
Assuming the findings made by the jury that a doctor on the staff of the defendant hospital assured the plaintiff mother that she did not need a therapeutic abortion and that she should not seek an abortion elsewhere, the jury could find that the defendant hospital breached a duty it owed the plaintiff mother.
There is a line of cases holding that a “ physician is under an obligation to disclose to his patient serious or statistically frequent risks of the proposed treatment.” (5A Personal Injury Actions, Defenses, Damages, p. 23, § 1.01, subd. [k].) A recent New York case adopting this principle is Di Rosse v. Wein (24 A D 2d 510, mot. for lv. to app. den. 16 N Y 2d 487). In its opinion, the Appellate Division, Second Department, stated that, “ under the facts and circumstances disclosed by this record, including the fact that no immediate emergency existed, defendant was obligated to make a reasonable disclosure to his patient of the known dangers which were incident to or possible in the proposed [therapy].” (24 A D 2d 510.)
In the instant case there was no proof of any kind that anyone connected with the defendant hospital ever told Mrs. Stewart that two out of the four physicians who examined her and reviewed her medical history were of the opinion that her pregnancy should be terminated. It requires only a slight extension of the principle stated in Di Rosse v. Wein (supra) (if indeed there is any extension at all), to say that the defendant hospital was obligated to inform the plaintiff mother that the committee physicians charged with the duty of deciding whether to perform an abortion was divided equally on the question. Since refusal to perform an abortion meant that Mrs. Stewart, the plaintiff mother, would be risking the birth of a handicapped baby, it is not unreasonable to say that a prudent hospital would have disclosed to Mrs. Stewart the fact that two of the four doctors on its committee believed her pregnancy should be terminated. Such a disclosure by the defendant hospital would be the equivalent of the “reasonable disclosure” of the risks inherent in proposed therapy that a physician is required to make to a patient before employing such therapy. Here the therapy decided upon was not to abort. Mrs. Stewart was entitled to *439 know that two doctors did not agree with that therapy, for that knowledge might impel her to seek another opinion elsewhere.
The jury could also have found that it was malpractice for the defendant hospital to dissuade Mrs. Stewart from going elsewhere for an abortion. The evidence adduced at the trial demonstrated that the defendant hospital was not the only reputable hospital in the City of New York that performed abortions in instances where a pregnant woman had contracted rubella early in her pregnancy. In dissuading Mrs. Stewart from seeking the services of another hospital it gave her a false assurance that in her case an abortion was not indicated.
(c) The third cause of action:
The jury returned a verdict, in the sum of $1, in favor of the plaintiff father on this cause of action. The court charged the jury that any cause of action the father may have is derived from the mother’s cause of action and that they were to assess his damages on that basis, not on the basis that the father’s cause of action is a derivative of the infant’s cause of action.
Accordingly, the defendant’s motion to set aside the verdicts and to dismiss the complaint is determined as follows:
1. The verdict in the sum of $100,000, in favor of the infant plaintiff, is set aside and the first cause of action is dismissed.
2. The motion is in every other respect denied.