Dwight A. PHILLIPS and Kathleen D. Phillips, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 79–551–8.

United States District Court, D. South Carolina, Charleston Division.

Jan. 19, 1981.

Ellis I. Kahn, Charleston, S. C., for plaintiffs Dwight A. Phillips and Kathleen D. Phillips.

Jack L. Marshall, Columbia, S. C., for defendant United States.

## ORDER

BLATT, District Judge.

This matter is before the court on defendant's motion for summary judgment pursuant to Rule 12(b) and Rule 56(b) of the Federal Rules of Civil Procedure. The action was brought under the Federal Tort Claims Act, and jurisdiction is predicated on 28 U.S.C. § 1346(b). Defendant's motion asserts, *inter alia*, that any failure by defendant's employees in advising, counseling, and testing plaintiff Kathleen Phillips during her pregnancy concerning the risks of Down's Syndrome would not constitute actionable negligence; that an allegation of "wrongful birth"[1] does not state a claim upon which relief can be granted; that plaintiffs have not suffered any damage cognizable at law; that plaintiffs do not have standing to maintain this cause of

---

1. A clear delineation of certain terminological distinctions is essential to a proper understanding of the theoretical issues raised by plaintiffs' claim. A "wrongful birth" claim is an action brought against "a physician [who] failed to inform parents of the increased possibility that the mother would give birth to a child suffering from birth defects ... [, thereby precluding] an informed decision about whether to have the child." 8 Hofstra L.Rev. 257, 257–58 (1979). Actions of this type

> are brought by parents who claim they would have avoided conception or terminated the pregnancy had they been properly advised of the risk of birth defects to the potential child. These parents seek recovery for their expenses in caring for the deformed child, and for their own pain and suffering.

54 Tulane L.Rev. 480, 484 (1980). *E. g., Berman v. Allan*, 80 N.J. 421, 404 A.2d 8 (1979). The corresponding action by the defective child for damages he may suffer in such a situation is denominated one for "wrongful life." *E. g., Curlender v. Bio-Science Laboratories*, 106 Cal. App.3d 811, 165 Cal.Rptr. 477 (Ct.App.1980); *Cohen, Park v. Chessin: The Continuing Judicial Development of the Theory of "Wrongful Life,"* 4 Am.J.L. & Med. 211 (1979); *Trotzig, The Defective Child and the Actions for Wrongful Life and Wrongful Birth*, 14 Fam.L.Q. 15 (1980).

In contradistinction to a "wrongful birth" claim, an action for "wrongful pregnancy" or "wrongful conception" is generally brought by the parents of a healthy, but unwanted, child against a pharmacist or pharmaceutical manufacturer for negligently filling a contraceptive prescription, or against a physician for negligently performing a sterilization procedure or an abortion. *E. g., Coleman v. Garrison*, 349 A.2d 8 (Del.1975); *Troppi v. Scarf*, 31 Mich. App. 240, 187 N.W.2d 511 (1971); *Robertson, Civil Liability Arising from "Wrongful Birth" Following an Unsuccessful Sterilization Operation*, 4 Am.J.L. & Med. 131 (1978); *Comment, Pregnancy After Sterilization: Causes of Action for Parent and Child*, 12 J.Fam.L. 635 (1972). Thus, " 'wrongful pregnancy' actions typically involve a *healthy*, but *unwanted*, child. 'Wrongful birth' actions, on the other hand, usually involve *planned* children who are born *deformed*." 54 Tulane L.Rev. 480, 485 (1980) (emphasis in original). There can, however, be some overlap between these categories; for example, a few "wrongful pregnancy" cases involve unplanned children who, coincidentally, were born with congenital defects. *E. g., LaPoint v. Shirley*, 409 F.Supp. 118 (W.D. Tex.1976); *Bowman v. Davis*, 48 Ohio St.2d 41, 356 N.E.2d 496 (1976); *Speck v. Finegold*, 268 Pa.Super. 342, 408 A.2d 496 (Pa.Super.1976). It should also be noted that judicial adherence to this terminology has not been uniform, with many courts utilizing the term "wrongful birth" to describe "wrongful pregnancy" claims. *E. g., Custodio v. Bauer*, 251 Cal. App.2d 303, 59 Cal.Rptr. 463 (1967); Annot., 83 A.L.R.3d 15 (1978). Nonetheless, the recent decisions have been more precise in their language, *e. g., Sherlock v. Stillwater Clinic*, 260 N.W.2d 169 (Minn.1977); *Becker v. Schwartz*, 46 N.Y.2d 401, 386 N.E.2d 807, 413 N.Y.S.2d 895 (1978), and this court feels that these distinctions are essential to the development of a functional analytic framework. Perhaps the most compelling justification for this terminology is provided by those jurisdictions that recognize "wrongful birth" claims, but not "wrongful pregnancy" claims. *Compare Jacobs v. Theimer*, 519 S.W.2d 846 (Tex.1975) *and Dumer v. St. Michael's Hosp.*, 69 Wis.2d 766, 233 N.W.2d 372 (1975) *with Terrell v. Garcia*, 496 S.W.2d 124 (Tex.Civ.App.1973), *cert. denied*, 415 U.S. 927, 94 S.Ct. 1434, 39 L.Ed.2d 484 (1974) *and Rieck v. Medical Protective Co.*, 64 Wis.2d 514, 219 N.W.2d 242 (1974).

action; and that plaintiffs' claim is barred by the misrepresentation exclusion of the Federal Tort Claims Act, 28 U.S.C. § 2680(h). While numerous other jurisdictions have been confronted with claims of this nature,[2] the case is one of first impression in South Carolina. Therefore, this court is once again[3] faced with the formidable task of anticipating the decision that the South Carolina Supreme Court would reach if presented with the issue—a task which can be accomplished only by a prudent and assiduous review of both the factual circumstances and legal precedents.

## FINDINGS OF FACT

1. Plaintiffs, Dwight A. Phillips and Kathleen D. Phillips, are the parents of William Randall Phillips. He was born on September 23, 1977, at the Charleston Naval Regional Medical Center (CNRMC) in Charleston, South Carolina, where his father was on active duty with the United States Navy. The child was noted at birth to be afflicted with Down's Syndrome,[4] commonly known as mongolism, as well as a moderately loud heart murmur.

2. On August 9, 1976, during a previous pregnancy, plaintiff, Kathleen D. Phillips,

---

2. *Gildiner v. Thomas Jefferson Univ. Hosp.*, 451 F.Supp. 692 (E.D.Pa.1978); *Anderson v. Wagner*, 61 Ill.App.3d 822, 19 Ill.Dec. 190, 378 N.E.2d 805 (1978); *Berman v. Allan*, 80 N.J. 421, 404 A.2d 8 (1979); *Gleitman v. Cosgrove*, 49 N.J. 22, 227 A.2d 689 (1967); *Becker v. Schwartz*, 60 App.Div.2d 587, 400 N.Y.S.2d 119 (1977), *modified*, 46 N.Y.2d 401, 386 N.E.2d 807, 413 N.Y.S.2d 895 (1978); *Park v. Chessin*, 60 App.Div.2d 80, 400 N.Y.S.2d 110 (1977), *modified sub nom.*, *Becker v. Schwartz*, 46 N.Y.2d 401, 486 N.E.2d 807, 413 N.Y.S.2d 895 (1978); *Johnson v. Yeshiva Univ.*, 53 App. Div.2d 523, 384 N.Y.S.2d 455 (1976), *aff'd*, 42 N.Y.2d 818, 364 N.E.2d 1340, 396 N.Y.S.2d 647 (1977); *Howard v. Lecher*, 42 N.Y.2d 109, 366 N.E.2d 64, 397 N.Y.S.2d 363 (1977); *Karlsons v. Guerinot*, 57 App.Div.2d 73, 394 N.Y.S.2d 933 (1977); *Greenberg v. Kliot*, 47 App.Div.2d 765, 367 N.Y.S.2d 966 (1975) (mem.) (facts summarized in *Park v. Chessin*, 60 App.Div.2d 80, 93, 400 N.Y.S.2d 110, 116–18 (1977) (Titone, J., dissenting)); *Stewart v. Long Island Coll. Hosp.*, 58 Misc.2d 432, 296 N.Y.S.2d 41 (Sup. Ct.1968), *modified*, 35 App.Div.2d 531, 313 N.Y. S.2d 502 (1970), *aff'd mem.*, 30 N.Y.2d 695, 283 N.E.2d 616, 332 N.Y.S.2d 640 (1972); *Jacobs v. Theimer*, 519 S.W.2d 846 (Tex.1975); *Dumer v. St. Michael's Hosp.*, 69 Wis.2d 766, 233 N.W.2d 372 (1975). *See generally* Annot., 83 A.L.R.3d 15 (1978).

As suggested in note 1, *supra*, additional insight into these complex issues may be provided by "wrongful pregnancy" claims, which comprise a more extensive body of case law. *E. g., Bishop v. Byrne*, 265 F.Supp. 460 (S.D.W. Va.1967); *Stills v. Gratton*, 55 Cal.App.3d 698, 127 Cal.Rptr. 652 (1976); *Custodio v. Bauer*, 251 Cal.App.2d 303, 59 Cal.Rptr. 463 (1967); *Anonymous v. Hospital*, 33 Conn.Supp. 126, 366 A.2d 204 (1976); *Coleman v. Garrison*, 349 A.2d 8 (Del.1975); *Public Health Trust v. Brown*, 388 So.2d 1084 (Fla.App.1980). *Jackson v. Anderson*, 230 So.2d 503 (Fla.App.1970); *Hackworth v. Hart*, 474 S.W.2d 377 (Ky.1971); *Troppi v. Scarf*, 31 Mich.App. 240, 187 N.W.2d 511 (1971); *Sherlock v. Stillwater Clinic*, 260

N.W.2d 169 (Minn.1977); *Christensen v. Thornby*, 192 Minn. 123, 255 N.W. 620 (1934); *Betancourt v. Gaylor*, 136 N.J.Super. 69, 344 A.2d 336 (1975); *West v. Underwood*, 132 N.J.L. 325, 40 A.2d 610 (1945); *Ziemba v. Sternberg*, 45 App.Div.2d 230, 357 N.Y.S.2d 265 (1974); *Milde v. Leigh*, 75 N.D. 418, 28 N.W.2d 530 (1947); *Bowman v. Davis*, 48 Ohio St.2d 41, 356 N.E.2d 496 (1976); *Shaheen v. Knight*, 6 Lycoming Rep. 19, 11 Pa.D. & C.2d 41 (1957); *Vaughn v. Shelton*, 514 S.W.2d 870 (Tenn.App. 1974); *Terrell v. Garcia*, 496 S.W.2d 124 (Tex. Civ.App.1973); *cert. denied*, 415 U.S. 927, 94 S.Ct. 1434, 39 L.Ed.2d 484 (1974); *Ball v. Mudge*, 64 Wash.2d 247, 391 P.2d 201 (1964); *Ball v. Mudge*, 64 Wash.2d 248, 391 P.2d 201 (1964); *Rieck v. Medical Protective Co.*, 64 Wis.2d 514, 219 N.W.2d 242 (1974). *See generally* Annot., 83 A.L.R.3d 15 (1978).

3. By an order filed December 12, 1980, this court dismissed a "wrongful life" claim in a companion case brought by plaintiffs' child, which had presented a similarly novel cause of action. *Phillips v. United States*, 508 F.Supp. 537 (D.S.C., 1980) (order granting defendant's motion for summary judgment).

4. Down's Syndrome has been defined by one medical authority as

a syndrome of mental retardation associated with a variable constellation of abnormalities caused by representation of at least a critical portion of chromosome 21 three times instead of twice in some or all cells; ... the abnormalities include retarded growth, hypoplastic face with short nose, prominent epicanthic skin folds, protruding lower lip, small rounded ears with prominent antihelix, fissured and thickened tongue, laxness of joint ligaments, pelvic dysplasia, broad hands and feet, stubby fingers ... dry rough skin in older patients and abundant slack neck skin in newborn ....

Stedman's Medical Dictionary 1382 (4th unabr. lawyer's ed. W. Dornette 1976).

made her initial visit to the obstetrics clinic at CNRMC. At that time, Mrs. Phillips was in her twelfth week of pregnancy. In completing a prenatal questionnaire, she indicated, among other information, that she was twenty-two years of age, that she had not previously borne any children, and that her sister was "mentally retarded." Less than a week later, she experienced an apparent spontaneous abortion, for which she was hospitalized and treated with a therapeutic uterine cervix dilation and curettage.

3. On March 22, 1977, during a subsequent pregnancy, Mrs. Phillips again visited the obstetrics clinic at CNRMC. In responding to a section on the prenatal questionnaire concerning any family history of mental retardation, Mrs. Phillips noted that her sister was afflicted with Down's Syndrome. She also indicated that her last menstrual period was December 14, 1976; therefore, at the time of this visit, Mrs. Phillips was approximately fourteen weeks pregnant. She returned to CNRMC on April 17, 1977, and saw Dr. Robert K. Sadler, a second year obstetrics resident, who noted that she was in her seventeenth or eighteenth week of gestation and that she reported a family history which included a "sister with Down's Syndrome." Mrs. Phillips was given no further counseling or genetic testing based on this information.[5] The pregnancy culminated with the birth of William Randall Phillips on September 23, 1977.

## CONCLUSIONS OF LAW

A. *Applicability of Misrepresentation Exclusion of Federal Tort Claims Act*

■ Defendant asserts that plaintiffs' claims are barred by the misrepresentation exclusion contained in the Federal Tort Claims Act, 28 U.S.C. § 2680(h). While the Act provides for liability against the United States under certain circumstances, that section specifically excepts "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution,

abuse of process, libel, slander, *misrepresentation*, deceit, or interference with contract rights." *Id.* (emphasis added). Of course, questions concerning the import of this exclusionary language are governed by federal law. *See Stepp v. United States*, 207 F.2d 909, 911 (4th Cir. 1953). The Supreme Court has interpreted this section as evidencing a legislative intent to preclude the "traditional and commonly understood" torts of negligent misrepresentation and common-law deceit. *United States v. Neustadt*, 366 U.S. 696, 705–08, 711 n.26, 81 S.Ct. 1294, 1299–1301, 1302–1303 n.26, 6 L.Ed.2d 614 (1961). The Court went on to note that

many familiar forms of negligent conduct may be said to involve an element of "misrepresentation", in the generic sense of the word, but "[s]o far as misrepresentation has been treated as giving rise in and of itself for a distinct cause of action in tort, it has been identified with the common law action of deceit," and has been confined "very largely to the invasions of interests of a financial or commercial character, in the course of business dealings."

*Id.* at 711 n.26, 81 S.Ct. at 1302–1303 n.26, *quoting* W. PROSSER, LAW OF TORTS, § 85 (1941 ed.).

While *Neustadt* interpreted § 2680(h) in the context of the National Housing Act, 12 U.S.C. §§ 1701 *et seq.*, a number of lower courts have examined the misrepresentation exclusion in a medical malpractice setting. In *Hungerford v. United States*, 307 F.2d 99 (9th Cir. 1962) and *DeLange v. United States*, 372 F.2d 134 (9th Cir. 1967), the Ninth Circuit Court of Appeals apparently held that the communicated diagnosis of a physical condition was a representation within the meaning of § 2680(h), but this position was convincingly repudiated in a subsequent *en banc* decision, *Ramirez v. United States*, 567 F.2d 854 (9th Cir. 1977). In *Ramirez*, the court explicitly overruled *Hungerford* and *DeLange*, and held that "[t]he creation of strained distinctions to

---

5. The primary medical procedure that defendant failed to perform is an amniocentesis test, in which a small amount of the amniotic fluid surrounding the fetus is extracted and analyzed for chromosomal abnormalities. *See* 2 Am.J. Trial Advocacy, 107, 123–26 (1978).

encompass aspects of ordinary medical malpractice within the misrepresentation exception of section 2680(h) is not justified by the language of the statute, by its history, or by *Neustadt."* *Id.* at 857. The court also discerned in the legislative history of the Federal Tort Claims Act a "policy of . . . allowing actions for medical malpractice." *Id.; e. g.,* S.Rep.No.211, 72d Cong., 1st Sess. (1931); H.R.Rep.No.5065, 72d Cong., 1st Sess. (1932), *noted in* 1 L. Jayson, Handling Federal Tort Claims, § 59.08 (Matthew Bender 1980). *See United States v. Muniz,* 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963). Although one court has suggested that there may be a limited class of medical situations, involving *solely* a failure to inform, to which § 2680(h) would be relevant, as, for example, "[w]here there is a breach of a duty to correctly inform a patient concerning the nature and consequences of an operation, but the operation is medically indicated and performed in accordance with the applicable standards of medical care," *Herring v. Knab,* 458 F.Supp. 359, 362–63 (S.D.Ohio 1978), most medical situations involve "a dual duty in ascertaining the patient's condition—i. e., a duty to advise him what the condition is, and a duty to render proper care and treatment for that condition— [and] breach of the latter duty is actionable even though the former is not." 2 L. JAYSON, *supra,* at § 260.05[3][c]. "Where the gravamen of the complaint is the negligent performance of operational tasks, rather than misrepresentation, the government may not rely on § 2680(h) to absolve itself of liability." *Ingham v. Eastern Air Lines, Inc.,* 373 F.2d 227, 239 (2d Cir. 1967). In the case at hand, the complaint alleges a failure to properly advise, counsel, and test Mrs. Phillips with respect to certain genetic risks; such a medical malpractice claim is not precluded by § 2680(h) of the Federal Tort Claims Act. *E. g., Ramirez v. United States,* 567 F.2d 854 (9th Cir. 1977); *Hicks v. United States,* 511 F.2d 407 (D.C.Cir. 1975); *Beech v. United States,* 345 F.2d 872 (5th Cir. 1965); *Diaz Castro v. United States,* 451 F.Supp. 959 (D. Puerto Rico 1978); *Herring v. Knab,* 458 F.Supp. 359

(S.D.Ohio 1978); *Green v. United States,* 385 F.Supp. 641 (S.D.Cal.1974). *See Hicks v. United States,* 368 F.2d 626 (4th Cir. 1966). Since

the government physicians, apart from any duty to disclose pertinent medical facts, have the affirmative obligation to render proper care in the treatment of maladies . . ., . . . the failure to perform this latter duty . . . takes these cases out of the ambit of the [misrepresentation] exclusion where such failure is properly pleaded.

*Diaz Castro v. United States,* 451 F.Supp. 959, 961 (D. Puerto Rico 1978). Thus, this court has concluded that plaintiffs' "wrongful birth" claim, predicated on an alleged failure to advise, counsel, and test Mrs. Phillips, is not barred by the misrepresentation exclusion contained in § 2680(h) of the Federal Tort Claims Act.

### B. Validity of "Wrongful Birth" Claim

Counsel for the respective parties agree that there is no controlling decision in South Carolina governing the novel issues raised by plaintiffs' "wrongful birth" claim. Under the Federal Tort Claims Act, this court is bound to follow "the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b); *e. g., Long v. United States,* 241 F.Supp. 286 (W.D.S.C.1966); however, in the absence of such controlling law, this court must attempt to predict the determination that the state supreme court would reach on the question. *Quinones v. United States,* 492 F.2d 1269 (3rd Cir. 1974). A particularly appropriate example of this process, albeit in a diversity context, is provided by *Todd v. Sandidge Construction Co.,* 341 F.2d 75 (4th Cir. 1964), a case arising in the District Court for the Eastern District of South Carolina, in which the Fourth Circuit Court of Appeals correctly anticipated the South Carolina Supreme Court's decision in *Fowler v. Woodward,* 244 S.C. 608, 138 S.E.2d 42 (1964), by finding that a claim of tortious prenatal injury to a viable fetus did state a cause of action for wrongful death under South Carolina law. Moreover, the state Supreme Court's awareness of the contemporary problems in this area is infer-

entially supported by language in *Baldwin v. Sanders,* 266 S.C. 394, 223 S.E.2d 602 (1976), affirming the trial court's refusal to grant a demurrer for failure to state a claim in a "wrongful pregnancy" [6] case. *Id.* at 397, 223 S.E.2d at 603. In light of the increasing importances of these issues and their unsettled status in South Carolina, the duty of this court to resolve the issues can only be discharged by a careful survey of the state of the law nationwide, as well as an examination of the theoretical underpinnings of the existing decisions.

As previously noted,[7] six jurisdictions have considered "wrongful birth" claims in approximately fifteen reported decisions, with numerous other jurisdictions having considered "wrongful pregnancy" claims. The majority of those cases—indeed, the overwhelming majority of the more recent cases—have recognized the validity of "wrongful birth" claims; this trend is implicitly conceded by the defendants.[8] Although some of the earlier decisions denied recovery, *e. g., Gleitman v. Cosgrove,* 49 N.J. 22, 227 A.2d 689 (1967); *Johnson v. Yeshiva Univ.,* 53 App.Div.2d 523, 384 N.Y. S.2d 455, aff'd, 42 N.Y.2d 818, 364 N.E.2d 1340, 396 N.Y.S.2d 647 (1977); *Stewart v. Long Island Coll. Hosp.,* 58 Misc.2d 432, 296 N.Y.S.2d 41 (Sup.Ct.1968), *modified,* 35 App.Div.2d 531, 313 N.Y.S.2d 502 (1970), *aff'd mem.,* 30 N.Y.2d 695, 283 N.E.2d 616, 332 N.Y.S.2d 640 (1972), the jurisdictions that have reached the merits of the controversy are currently unanimous in their recognition of the cause of action. *Gildiner v. Thomas Jefferson Univ. Hosp.,* 451 F.Supp. 692 (E.D.Pa.1978) (applying Pennsylvania law); *Berman v. Allan,* 80 N.J. 421, 404 A.2d 8 (1979); *Becker v. Schwartz,* 46 N.Y.2d 401, 386 N.E.2d 807, 413 N.Y.S.2d 895 (1978); *Jacobs v. Theimer,* 519 S.W.2d 846 (Tex.1975); *Dumer v. St. Michael's Hosp.,* 69 Wis.2d 766, 233 N.W.2d 372 (1975). A similar trend is apparent with "wrongful pregnancy" claims. *See generally* Annot., 83 A.L.R.3d 15 (1978). Despite a few recent cases to the contrary, *e. g., Terrell v. Gar-*

cia, 496 S.W.2d 124 (Tex.Civ.App.1973); *Rieck v. Medical Protective Co.,* 64 Wis.2d 514, 219 N.W.2d 242 (1974), "wrongful pregnancy" actions "have ... met with considerable success since 1967 [when the leading case of *Custodio v. Bauer,* 251 Cal. App.2d 303, 59 Cal.Rptr. 463 (1967) was decided]. Although the courts have not been in agreement on how to assess damages, the majority now allow recovery of some sort to the parents." Trotzig, *The Defective Child and the Actions for Wrongful Life and Wrongful Birth,* 14 Fam.L.Q. 15, 18 (1980). With this overview in mind, it is helpful to examine the theoretical issues in greater detail.

■ In the first reported "wrongful birth" decision, *Gleitman v. Cosgrove,* 49 N.J. 22, 227 A.2d 689 (1967), the New Jersey Supreme Court's rejection of plaintiffs' claim was based on the impossibility of ascertaining damages, *id.* at 29, 227 A.2d at 693, and the perceived public policy against abortion, *id.* at 30–31, 227 A.2d at 693. The court reasoned that the determination of the parents' compensatory damages would entail balancing "the intangible, immeasurable, and complex human benefits of motherhood and fatherhood ... against the alleged emotional and money injuries. Such a proposed weighing is impossible to perform." *Id.* at 29, 227 A.2d at 693. This ascertainment of damages argument was, in reality, a thinly-disguised policy argument, borrowed from earlier "wrongful pregnancy" cases, *e. g., Christensen v. Thornby,* 192 Minn. 123, 255 N.W. 620 (1934); *Shaheen v. Knight,* 6 Lycoming Rep. 19, 11 Pa.D. & C.2d 41 (1957), which presupposed that the birth of a child was a "blessed event," the benefits of which would as a matter of law outweigh its burdens. This court, however, finds such reasoning unpersuasive. As the Minnesota Supreme Court stated, it would be "myopic to declare today that the benefits [of parenthood] exceed the costs as a matter of law." *Sherlock v. Stillwater Clinic,* 260 N.W.2d

---

**6.** See note 1, *supra.*

**7.** See note 2, *supra.*

**8.** Brief for Defendant at 6.

169, 175 (Minn.1977) ("wrongful pregnancy" claim). In calculating plaintiff's damages, any benefits they derive from defendant's negligence may properly be offset against the detriments which flow from that conduct, in accordance with traditional tort principles. RESTATEMENT (SECOND) OF TORTS, § 920 (1977). E. g., Troppi v. Scarf, 31 Mich.App. 240, 187 N.W.2d 511 (1971) ("wrongful pregnancy" claim). The complexity of this balancing process is not, however, directly relevant to the validity of the cause of action; if a claim is legally cognizable, mere difficulty in the ascertainment of damages would be insufficient to preclude the action. Story Parchment Co. v. Paterson Co., 282 U.S. 555, 563, 51 S.Ct. 248, 250–251, 75 L.Ed. 544 (1931); Thompson v. Brotherhood of Sleeping Car Porters, 367 F.2d 489 (4th Cir. 1966) cert. denied, 386 U.S. 960, 87 S.Ct. 1019, 18 L.Ed.2d 110 (1967); Harrison & Sons, Inc. v. J. I. Case Co., 180 F.Supp. 243 (E.D.S.C.1960); Haltiwanger v. Barr, 258 S.C. 27, 186 S.E.2d 819 (1972); Powers v. Calvert Fire Ins. Co., 216 S.C. 309, 57 S.E.2d 638 (1950). As the New Jersey Supreme Court subsequently declared in rejecting the Gleitman ascertainment of damages rationale, "to deny . . . redress for . . . [these] injuries merely because damages cannot be measured with precise exactitude would constitute a perversion of fundamental principles of justice." Berman v. Allan, 80 N.J. 421, 433, 404 A.2d 8, 15 (1979). The more recent cases have not found the difficulty in calculating damages to be an insurmountable obstacle. E. g., Becker v. Schwartz, 46 N.Y.2d 401, 415, 386 N.E.2d 807, 814, 413 N.Y.S.2d 895, 903 (1978); Jacobs v. Theimer, 519 S.W.2d 846, 849 (Tex.1975).

The second argument against "wrongful birth" claims advanced in Gleitman was the policy disfavoring abortion, 49 N.J. at 30–31, 227 A.2d at 693, a rationale that was also espoused by other early cases. Stewart v. Long Island Coll. Hosp., 58 Misc.2d 432, 296 N.Y.S.2d 41 (Sup.Ct.1968), modified, 35 App.Div.2d 531, 532, 313 N.Y.S.2d 502, 503 (1970), aff'd mem., 30 N.Y.2d 695, 283 N.E.2d 616, 332 N.Y.S.2d 640 (1972). The legitimacy of this policy was constitutionally suspect even at the time it was initially advanced, see Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), and these objections gained greater potency with the landmark abortion decisions of Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). The New Jersey Supreme Court rectified its error in Berman, holding that this abortion rationale could "no longer stand in the way of judicial recognition of a cause of action founded upon wrongful birth." 80 N.J. at 431, 404 A.2d at 13. E. g., Gildiner v. Thomas Jefferson Univ. Hosp., 451 F.Supp. 692, 695–96 (E.D.Pa. 1978); Dumer v. St. Michael's Hosp., 69 Wis.2d 766, 233 N.W.2d 372 (1975). Indeed, subsequent cases have suggested that failure to recognize "wrongful birth" or "wrongful pregnancy" claims could impermissibly burden the constitutional rights involved in conception, procreation, and other familial decisions. Sherlock v. Stillwater Clinic, 260 N.W.2d 169 (Minn.1977); Bowman v. Davis, 48 Ohio St.2d 41, 356 N.E.2d 496 (1976). See Troppi v. Scarf, 31 Mich. App. 240, 253, 187 N.W.2d 511, 517 (1971). At the very least, refusal to recognize this cause of action "would in effect immunize from liability those in the medical field providing inadequate guidance to persons who would choose to exercise their constitutional right to abort fetuses which, if born, would suffer from genetic defects." Berman v. Allan, 80 N.J. 421, 432, 404 A.2d 8, 14 (1979).

Thus, it can readily be seen that plaintiffs' claim falls within the traditional boundaries of negligence: the essential elements of duty, breach, proximate cause, and damage are undeniably present. As in any medical malpractice action, the physician is bound to the standard established by the skill and learning possessed by other members of his profession who are similarly situated. E. g., Ellis v. United States, 484 F.Supp. 4 (D.S.C.1978); Bessinger v. De Loach, 230 S.C. 1, 94 S.E.2d 3 (1956). See generally W. PROSSER, LAW OF TORTS, § 32 (4th ed. 1971). Plaintiffs' complaint

asserts that defendant's employees' failure to advise, counsel, and test Mrs. Phillips constituted a breach of this duty; although, in the final analysis, the validity of this assertion must be established by expert testimony at trial, the allegation can be taken as true for purposes of this motion. Similarly, "[t]he complaint states a sufficient causal relationship between the alleged negligence of the defendants and the failure of ... [the plaintiffs] to obtain an abortion to defeat a motion for judgment on the pleadings based on a lack of proximate cause." *Gildiner v. Thomas Jefferson Univ. Hosp.*, 451 F.Supp. 692, 695 (E.D.Pa. 1978). Finally, although the question of damages has presented a difficult and troublesome problem to the courts that have considered "wrongful birth" claims, with that difficulty engendering widely divergent approaches, *see* Comment, *Wrongful Birth Damages*, 13 Val.U.L.Rev. 127 (1978), the previous analysis convinces this court that some type of damages would be appropriate in the present case. While it would be premature to demarcate the ultimate limits of "wrongful birth" damages at this stage in the litigation, "[b]ecause at least some damages are cognizable at law, the motion for judgment on the pleadings may not be granted for lack of damages." *Gildiner*, 451 F.Supp. at 696.

This court is also convinced that the relevant policy considerations, far from militating against the cause of action, actually support its recognition.

> Society has an interest in insuring that genetic testing is properly performed and interpreted. The failure to properly perform or interpret an amniocentesis could cause either the abortion of a healthy fetus, or the unwanted birth of ... [an afflicted] child .... Either of these occurrences is contrary to ... public policy .... The recognition of a cause of action for negligence in the performance of genetic testing would encourage the accurate performance of such testing by penalizing physicians who fail to observe customary standards of good medical practice.

*Gildiner*, 451 F.Supp. at 696. The increasing importance of these procedures in modern life and their entry into the mainstream of accepted medical practices, *see* Saul, *et al., Amniocentesis and Prenatal Diagnosis in South Carolina: A Collaborative Report for the Years 1976 to 1979*, 76 J.S.C. Med. Ass'n. 387, 387–88, 389 (1980), as well as the extreme sensitivity of the issues and interests involved, dictate that plaintiffs' rights be afforded some protection. The most appropriate mechanism for this protection is the ancient, yet vital and constantly evolving doctrine of negligence. Therefore, this court does not find that plaintiffs' "wrongful birth" claim states a new and distinct cause of action, but rather that their injury can be redressed through conventional tort principles. In this way, the resolution of these issues does not infringe on a legislative prerogative as some courts have suggested, *e. g., Becker v. Schwartz*, 46 N.Y.2d 401, 386 N.E.2d 807, 413 N.Y.S.2d 895 (1978); *Clegg v. Chase*, 89 Misc.2d 510, 391 N.Y.S.2d 966 (Sup.Ct.1977), since "[t]he determination of the scope of the common law doctrine of negligence is within the province of the judiciary." *Gildiner*, 451 F.Supp. at 696.

For the foregoing reasons, defendant's motion for summary judgment of plaintiffs' "wrongful birth" claim is denied, based on the conclusion that the South Carolina Supreme Court, if confronted with this issue, would recognize such an assertion as a legally cognizable cause of action, in keeping with both the trend of authorities and the applicable policy considerations. To do otherwise would truly "constitute a perversion of fundamental principles of justice." *Berman v. Allan*, 80 N.J. 421, 433, 404 A.2d 8, 15 (1979). This conclusion is also buttressed by the strong factual similarities between the present case and other "wrongful birth" decisions concerning Down's Syndrome. *Id.; Becker v. Schwartz*, 60 App.Div.2d 587, 400 N.Y.S.2d 119 (1977), *modified*, 46 N.Y.2d 401, 386 N.E.2d 807, 413 N.Y.S.2d 895 (1978). Finally, inferential support for this conclusion is provided by *Baldwin v. Sanders*, 266 S.C. 394, 223 S.E.2d 602 (1976), in which the Supreme Court affirmed the

trial court's refusal to grant a demurrer for failure to state a claim in a "wrongful pregnancy" case. *Id.* at 397, 223 S.E.2d at 603. For these reasons, defendant's motion for summary judgment is denied.

AND IT IS SO ORDERED.